**NATIONAL LABOR RELATIONS
BOARD**

v.

**WEMYSS.**

**No. 13844.**

United States Court of Appeals
Ninth Circuit.

April 20, 1954.

Rehearing Denied May 24, 1954.

George J. Bott, General Counsel, David P. Findling, Associate General Counsel, A. Norman Somers, Asst. General Counsel, Washington, D. C., David Karasick, San Francisco, Cal., Arnold Ordman, Alan R. Waterstone, Attorneys, N.L.R.B., Washington, D.C., for petitioner.

Ray L. Johnson, Jr., Carl M. Gould, Hill, Farrer & Burrill, Los Angeles, Cal., Lafayette J. Smallpage, Francis X. Vierira, Stockton, Cal., for respondent.

Before HEALY, BONE and POPE, Circuit Judges.

BONE, Circuit Judge.

This is a petition by the National Labor Relations Board for enforcement of an order issued by it against respondent Edwin D. Wemyss, d/b/a Coca-Cola Bottling Company of Stockton. The order was based upon findings that respondent formed, dominated, interfered with and contributed support to the Stockton Beverage Employees Association (herein the "Association"), a labor organization, in violation of § 8(a)(2) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 158(a)(2); that respondent entered into and gave effect to bargaining agreements with the Association containing unlawful union security provisions, in violation of § 8(a)(1) of the Act; and that respondent interfered with, restrained and coerced his employees in the exercise of their rights under § 7 of the Act, in violation of § 8(a)(1) of the Act, 29 U.S.C.A. §§ 157, 158(a)(1). The Board's order requires respondent to cease and desist from the unfair labor practices found, to cease recognizing the Association as bargaining representative of his employees, to disestablish the Association as such representative, and to post the usual notices. In its decision and order the Board adopted in full the findings, conclusions and recommendations set out in the Trial Examiner's Intermediate Report.

Respondent resists enforcement of the order on the grounds (1) that his operations do not affect interstate commerce, and the Board therefore lacked jurisdiction; (2) that the charge filed with the Board alleging that respondent instigated the formation of, dominated and controlled the formation of the Association was withdrawn, and so much of the Board's complaint as alleged such activity should therefore have been dismissed; (3) that the Board's finding that respondent formed, dominated, interfered with and contributed support

to the Association is not supported by substantial evidence on the record considered as a whole; and (4) that the record shows at most that respondent merely assisted the Association, and the Board's order is therefore improper insofar as it directs the disestablishment of the Association. The third and fourth contentions will be taken up together.

## I

Respondent is engaged in bottling, selling and distributing at wholesale bottled Coca-Cola, the well-known soft drink, in Stockton, California. He operates under a royalty agreement with Coca-Cola Bottling Company of Stockton, Ltd. (herein "the Corporation"), of which respondent is president and sole shareholder except for qualifying shares held by two other persons who serve as officers and directors. The Corporation has no employees. It owns a building which it leases to respondent where he conducts his Coca-Cola business and other enterprises.

The essence of the drink Coca-Cola is the Coca-Cola syrup. This syrup is manufactured by the Coca-Cola Company, a Delaware corporation, in plants owned by that company all over the United States. One of these plants is located in San Francisco. This plant supplies syrup to Pacific Coast Coca-Cola Bottling Company (herein "Pacific"), in which the Coca-Cola Company of Delaware owns an undisclosed amount of stock. Pacific, in turn, supplies respondent with Coca-Cola syrup pursuant to a franchise agreement between Pacific and the Corporation and the royalty agreement between the Corporation and respondent. Respondent receives advertising material through about the same channels.

In 1951, the year of the unfair labor practices found by the Board, respondent purchased supplies and materials valued at $192,699.66, of which amount $6,-340.54 was shipped directly to respondent's plant from outside the State of California and $22,522.94, although secured locally, originated from points outside the state. All respondent's sales were made within the state.

The franchise agreement between Pacific and the Corporation recited that Pacific had received from the Coca-Cola Company of Delaware certain rights with respect to the bottling and selling of Coca-Cola, that Pacific wished to convey such rights to the Corporation for a certain described territory, and that the Corporation was desirous of obtaining such rights. Under the agreement the Corporation obtained the exclusive right to bottle and distribute the drink Coca-Cola within the described territory, but was subjected to a very substantial amount of supervision and control by Pacific and the Coca-Cola Company of Delaware in the exercise of such rights. The franchise agreement, among other things, prohibited bottling or selling Coca-Cola syrup except in the carbonated soft drink form; prescribed the manner of bottling the drink and the kind of bottle and cap which were to be used; required maintenance of satisfactory plant and equipment, and required the Corporation to permit Pacific or the Coca-Cola Company of Delaware to make inspections thereof to see that the provisions of the agreement were being complied with; prohibited the bottling or selling of Coca-Cola outside the described territory; required the Corporation to "vigorously push" the sale of bottled Coca-Cola; and prohibited assignment of the franchise agreement in whole or in part without the consent of Pacific and the Coca-Cola Company of Delaware. Other provisions of the agreement emphasized the interdependence of the Corporation's Local and the Coca-Cola Company's national activities. Below the signatures of the parties to the agreement was the signature of the vice-president of the Coca-Cola Company of Delaware, under a statement reading: "Consented to: but pursuant to, and not altering, amending or changing, the contract between the Coca Cola Company [of Delaware] and Pacific Coast Coca-Cola Bottling Company." The royalty agreement between the Corporation and respondent conferred upon respondent all the rights and privileges of the Corpora-

tion under its franchise agreement with Pacific and subjected him to all the obligations and restrictions imposed by the latter agreement.

 The above facts, we think, establish that respondent's business is an integral part of the Coca-Cola Company's national system of distribution and is therefore subject to the Board's jurisdiction under the rationale of the recent Supreme Court decision in Howell Chevrolet Co. v. National Labor Relations Board, 346 U.S. 482, 74 S.Ct. 214; See American Bottling Co., 99 N.L.R.B. 345, enforced 5 Cir., 205 F.2d 421, certiorari denied 346 U.S. 921, 74 S.Ct. 306; cf. N. L.R.B. v. Seven-Up Bottling Co., 5 Cir., 196 F.2d 424, reversed on other points, 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377. Respondent's business being within the Board's jurisdiction, it was for the Board to determine, in its discretion, whether to exercise such jurisdiction, and we cannot say that the Board abused its discretion in determining to do so.

## II

The original unfair labor practice charge which initiated this proceeding was filed with the Regional Director for the Board by International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local No. 439, AFL (herein "Local 439") on August 21, 1951. The charge alleged that respondent instigated the formation of, dominated, controlled and supported the Association. M. C. Dempster, an investigator for the Board, investigated the charge. On January 7, 1952 Dempster asked Local 439 to amend its charge so as to omit the allegations that respondent instigated the formation of, domina-

ted and controlled the Association. Accordingly, Local 439 on February 7, 1952 filed an amended charge alleging *only* that respondent had contributed support to the Association. The Board, however, issued a complaint charging not only that respondent contributed support to the Association, but also that he instigated the formation of, dominated and controlled it. Respondent moved to dismiss that portion of the complaint alleging instigation, domination and control. The Trial Examiner denied the motion and was upheld by the Board. Respondent contends that this was error, relying upon a procedural regulation of the Board, 29 CFR § 102.9, quoted in the margin.[1]

 The argument of respondent is that *the original charge* of Local 439 was "withdrawn" and that there was therefore no charge of employer instigation, domination or control upon which a complaint could be predicated. We do not agree. The regulation relied upon, 29 CFR § 102.9, quoted in footnote 1, provides that a charge may be withdrawn prior to hearing only with the consent of the Regional Director with whom such charge was filed. There is no indication that the Regional Director consented to the withdrawal of the Union's original charge. The Union simply filed an amended charge. In such case the Board is not precluded from predicating a complaint upon the original charge. N.L.R.B. v. Kobritz, 1 Cir., 193 F.2d 8. Moreover, the Union's amended charge, which alleged respondent's support of Association, was a sufficient basis for the complaint's allegation of respondent's instigation, domination and control of Association. In issuing its complaint

1. "§ 102.9 Who may file; withdrawal or dismissal. A charge that any person has engaged in or is engaging in any unfair labor practice affecting commerce may be made by any person; * * * Any such charge may be withdrawn, prior to the hearing, only with the consent of the regional director with whom such charge was filed; at the hearing and until the case has been transferred to the Board pursuant to § 102.45, upon motion, with the consent of the trial examiner designated to conduct the hearing; and after the case has been transferred to the Board pursuant to § 102.45, upon motion, with the consent of the Board. Upon withdrawal of any charge, any complaint based thereon shall be dismissed by the regional director issuing the complaint, the trial examiner designated to conduct the hearing, or the Board."

the Board is not limited to the precise allegations of a charge but may include other matters which are closely related to or define more precisely its allegations, and the challenged allegations of the Board's complaint meet that test. See and compare N.L.R.B. v. Waterfront Employers of Washington, 9 Cir., 211 F.2d 946; N.L.R.B. v. Martin, 9 Cir., 207 F.2d 655.

### III

The trial examiner and the Board found, on the basis of substantial evidence on the record considered as a whole, the following facts with respect to respondent's alleged unfair labor practices:

Respondent had about 22 employees, exclusive of managerial, office and temporary employees. Prior to July of 1951 the employees were not represented by any union. On July 6, 1951, C. C. Allen, Secretary-Treasurer of Local 439, and other representatives of unions affiliated with the AFL met with respondent at his office. At this meeting respondent told the union representatives that the Teamsters' Local in nearby Modesto, California had wronged him by placing a Modesto Coca-Cola plant in which he had a financial interest on the Teamsters' unfair list. After a discussion of this complaint, respondent said he would be glad to talk to representatives of Local 439 if that union was kept separate from the Modesto union.

On July 13 Allen and other AFL representatives met with respondent and William Howell, respondent's general manager. Allen requested permission of respondent to talk to the employees, but respondent replied that he thought it would be better if he talked to them first. Not hearing from respondent, Allen called him on August 1 and again on August 7, requesting permission to talk to the employees. Each time he was refused on the ground that respondent was "still trying to get an expression from the men."

On August 8, Morgan Logan, one of respondent's employees, spoke to 8 or 10 of his co-workers about forming their own association. On the same day Logan asked General Manager Howell for permission to hold an election on respondent's premises to determine whether there was employee support for the formation of an independent union. Howell consented. Respondent and Howell then discussed and decided what employees should be eligible to vote in the election, and Howell thereupon prepared a list of the eligible voters. Howell also prepared the ballot, had the ballot box made, and caused a notice to be posted stating why the vote would be held and who would be eligible to vote. Respondent arranged for his accountant, Emile Jardine, to supervise the election. On August 9 Jardine, together with Logan, conducted the election on company time and company property. The result was 18 votes in favor of forming an independent association, 2 against. Two employees did not vote.

On August 10 (the day following the election) respondent invited Allen and two of his associates to come to his office. Respondent told them that the employees had formed an association of their own. Allen requested permission to speak to the employees, to which respondent replied by instructing Howell to speak to the president of the newly created Association about it. On August 13 respondent called the secretary of the Central Labor Council, AFL, and informed him that the Association's *president* "had decided not to meet with any representatives of the Teamsters' Union or the Central Labor Council." At that time, contrary to respondent's statement, the Association had not yet been formed and no officers had been elected.[2]

2. Respondent argues earnestly that the record does not sustain the finding that on August 13, 1951 the Association had not yet been formed or its officers elected. While the testimony on the point was confusing and conflicting, we think it was within the province of the trial examiner and the Board, as arbiters of the credibility of the witnesses, to find as they did. It is reasonably clear that the officers of the

Respondent and the Association thereafter entered into a 6-month collective bargaining agreement, effective September 1, 1951, containing union-security provisions. No election had been held to authorize the making of such an agreement, as was required by § 8(a)(3) of the Act prior to October 22, 1951.[3] The bargaining agreement made only a few changes in the terms and conditions of employment of the employees. In March of 1952 respondent and the Association entered into another agreement for approximately one year's duration which varied in only minor respects from the previous agreement. At no time herein pertinent had the Association complied with the requirements of §§ 9(f), (g) and (h) of the Act, as was required for execution of a valid union security agreement after the amendment of § 8(a)(3) of the Act on October 22, 1951 (see footnote 3).

From the foregoing facts it would appear that respondent was not at all pleased with the prospect of Local 439 attempting to organize his employees. He succeeded in stalling off Local 439's attempts for more than a month after July 6, 1951. Following the vote of the employees on August 9 in favor of forming an independent union, with Local

---

Association were elected at the first meeting of the employees after the August 9 election in the plant. The question was as to the date this first meeting was held. The first meeting at which minutes were taken was on September 12, 1951. It appears that no initiation fees or dues were collected prior to that date. Respondent's view that the officers were nonetheless elected prior to August 13 is supported to some extent by the testimony of respondent and General Manager Howell. But neither could testify with any certainty as to the date of the first employees' meeting. The trial examiner found, moreover, that Howell was not a reliable witness. The employee Logan, while testifying that September 12 was the date of the **third** meeting of the Association, could not place the date of the first meeting. He testified that it may have been August 13 or 14, or perhaps a week or two after the election, or perhaps close to the first of September. The employee Birdwell testified that the first meeting was about the middle of August or perhaps a couple of weeks or so after the election. Other employees testified similarly. Two employees testified that the first meeting was held on September 12. In view of the fact that it was on August 13, just four days after the election, that respondent told the Central Labor Council that the "president" of the Association did not want to speak to the AFL Teamsters, we think the Board was justified in finding, as it did, that on that date the Association had not yet been formed and its officers not yet elected.

3. "Sec. 8. (a) It shall be an unfair labor practice for an employer——

 * * * * *

"(3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: **Provided,** That nothing in this Act, or any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in section 8(a) of this Act as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 9(a), in the appropriate collective-bargaining unit covered by such agreement when made [; and (ii) if, following the most recent election held as provided in section 9(e) the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to authorize such labor organization to make such an agreement:] **and has at the time the agreement was made or within the preceding twelve months received from the Board a notice of compliance with sections 9(f), (g), (h), and (ii) unless following an election held as provided in section 9(e) within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement:** * * *"

Section 8(a) (3), a part of the Taft-Hartley Act, was amended on October 22, 1951, 65 Stat. 601. Provisions added by the amendment are in boldface; provisions eliminated by the amendment are in brackets.

439's request for permission to speak to the employees still outstanding, respondent on August 13 sought to put an end to Local 439's interest in the plant with his statement to a representative of the Central Labor Council, AFL, that the "president" of the Association did not want to speak to the Teamsters, when in fact the Association had not yet been formed and no officers had been elected.

■ By lending facilities and assistance to the organizers of the Association for the August 9 election, while closing his doors to Local 439, respondent conferred an unequal advantage on those who sought to form an independent union and failed to observe that neutrality which is required of employers on employee representation questions. National Labor Relations Board v. Waterman S. S. Corp., 309 U.S. 206, 224–226, 60 S.Ct. 493, 84 L.Ed. 704. To this extent, then, respondent did interfere with his employees' right to choose their bargaining representative, and contributed unlawful support to the Association, in violation of §§ 8(a) (1) and 8(a) (2) of the Act, respectively.[4]

■ It is also true, as the Board found, that respondent committed unfair labor practices by executing the bargaining agreements of September 1, 1951 and March 18, 1952 containing union security provisions. The union security provisions of the September agreement were unlawful because not authorized by a vote of the employees, as was then required by § 8(a)(3) of the Act (see footnote 3, supra). The similar provisions of the March agreement were illegal because the Association was not then in compliance with §§ 9(f), (g) and (h) of the Act, as was required by § 8(a) (3) of the Act after October 22, 1951. See footnote 3, supra; see also the comment on the October 22, 1951 amendment of § 8(a)(3) in the House Report on the amendment, House Report No. 1082, 82nd Congress, First Session, 1951 U.S.

Code Cong. and Adm. Service, Vol. 2, p. 2381. By executing these agreements respondent interfered with his employees' right to choose their bargaining representative, in violation of § 8(a)(1) of the Act, Katz v. N.L.R.B., 9 Cir., 196 F.2d 411, and contributed unlawful support to the Association, in violation of § 8(a)(2) of the Act. N.L.R.B. v. Gaynor News Co., 2 Cir., 197 F.2d 719, affirmed sub nom. Radio Officers' Union of Commercial Telegraphers Union, AFL v. National Labor Relations Board, 347 U.S. 17, 74 S.Ct. 323. The violations were of a technical character. The terms of the union security provisions were in accordance with § 8(a)(3) of the Act. Their illegality was due solely to noncompliance with procedural requirements imposed by § 8(a)(3) of the Act.

■■ We cannot, however, go along with the Board's conclusion that respondent "formed, dominated and interfered with the administration of the Association." In a case such as this, where admittedly the employer furnished no financial support to the employees' organization and did not formally participate in its administration, the question whether the organization is employer-dominated depends upon the state of mind of the employees, N.L.R.B. v. Sharples Chemicals, Inc., 6 Cir., 209 F.2d 645; the question is whether the organization exists as the result of a choice freely made by the employees, in their own interests, and without regard to the desires of their employer, or whether the employees formed and supported the organization, rather than some other, because they knew their employer desired it and feared the consequences if they did not. Cf. National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368; Ballston-Stillwater Knitting Co. v. N.L.R.B., 2 Cir., 98 F.2d 758, 762; Independent Emp. Ass'n of Neptune Meter Co. v. N.L.R.B., 2 Cir., 158 F.2d 448, 450; N.L.R.B. v. Mathie-

4. "Sec. 8. (a) It shall be an unfair labor practice for an employer—
"(1) to interfere with, restrain or coerce employees in the exercise of the rights guaranteed in section 7;

"(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: * * *".

son Alkali Works, 4 Cir., 114 F.2d 796, 802. In Wayside Press, Inc., v. N.L.R.B., 9 Cir., 206 F.2d 862, we held that an employer's furnishing of facilities and assistance for the organization of an inside union does not establish employer domination of such union, unless it occurs in a setting of such manifest employer preference for the proposed independent union or hostility toward an outside union that it intrudes upon the freedom of choice which the Act was designed to secure to employees. See also N.L.R.B. v. Mathieson Alkali Works, supra; N.L.R.B. v. Algoma Plywood & Veneer Co., 7 Cir., 121 F.2d 602.

The fact that respondent gave privileges in his plant to the organizers of the Association which he withheld from Local 439 supports findings of unlawful interference with the employees' rights and unlawful support of the favored organization; it warrants an order that the employer withdraw recognition from the favored organization unless and until it is certified by the Board after a fair election. But it does not, in itself, mean that the Association is "dominated" by the employer, or justify an order directing the employer to disestablish it and to refrain from ever again recognizing it as his employees' bargaining representative, as is done by the Board's order in this case. N.L.R.B. v. Braswell Motor Freight Lines, 5 Cir., 209 F.2d 622. Opposition to one labor organization does not necessarily mean "domination" of the other. The question is whether, notwithstanding the preferential organizational privileges given proponents of the Association in the plant, the employees had freedom to accept or reject the Association, without being coerced or restrained in such choice by respondent. *If they did,* then they must, at least, be left *the right* to maintain the Association by manifesting their desire to do so in a fair representation election. To direct the disestablishment of the Association in such circumstances would, we think, be an encroachment upon the employees' rights which would frustrate and not effectuate the purposes of the Act.

Applying these principles here, and considering the record as a whole (including a great deal of uncontradicted and undisputed evidence therein which was not mentioned in the trial examiner's findings) we think the Board's conclusion that respondent formed, dominated and interfered with the administration of the Association, and the Board's order directing that the Association be disestablished, cannot be sustained.

First of all, although the issues in this case were exhaustively explored in a hearing which lasted 9 days and resulted in a 1200 page record, there is not a shred of evidence, and the Board did not find, that respondent or his representatives ever made known to respondent's employees by any act, statement or otherwise, his opposition to Local 439 or any preference he might have had for an independent union. There is no evidence, and the Board did not find, that the employees were aware of any discussions between respondent and representatives of Local 439.

The evidence is that for about a month prior to the election on August 9 respondent's employees discussed the merits of forming their own organization. They had also discussed the possibility of joining Local 439 which, it appears, had contracts providing for lower wages than respondent's employees were then receiving.

On August 8, 1951, the employee Logan, after talking to 8 or 10 co-workers, approached General Manager Howell and requested use of the company's premises for an election to determine whether the employees wanted to form an independent association. Howell consented. Logan, who drove a truck, had to go out on his route and so could not take care of the arrangements for the election. Howell discussed the proposed election with respondent. They determined that the proposed independent union would probably represent all but managerial, office and temporary employees. Logan, prior to the election, discussed this matter with Howell and agreed that the bargaining unit should be so constituted. There was nothing in the least irregular

about the bargaining unit thus chosen, and there is no suggestion that it would have been different had Howell and respondent never discussed or proposed it. The "temporary" employees who were excluded, it appears, were mainly students who worked only after school hours.

Howell made up the list of eligible voters. He had the ballots prepared and also a crude cardboard ballot box. He caused notices of the election to be posted. Respondent engaged his accountant, Jardine, to supervise the election because, he testified, he wanted to see that the election was competently and impartially conducted.

At the election the next morning, August 9, Jardine acted with Logan in supervising the election. There is no evidence that the employees, except Logan, knew who Jardine was, or who made the ballots or the eligibility list, or who posted the notices. Some of the employees did not know about the election until the morning it was held.

The election was the only phase of the organizational effort with which respondent or his representatives had any concern. Thereafter the employees held evening meetings at the home of an employee at which the Association was formed and its officers and negotiating committee elected. They held regular monthly meetings thereafter at a hall which they rented with their own funds. They paid initiation fees and regular dues. They adopted their own constitution and by-laws. The negotiating committee met with General Manager Howell several times before entering into the September, 1951 bargaining agreement. By that agreement the employees obtained some, if not many improvements in terms and conditions of employment. Further negotiations preceded execution of the bargaining agreement in March of 1952. There is no evidence of any interference by respondent with the administration of the Association or any of its activities.

The fact that the merits of both the Teamsters Union and an independent union had been discussed among the employees for some time prior to the August 9 election; the total absence of evidence that respondent's preference as between the two was ever made known to his employees; the lack of evidence that the employees knew of any dealings between respondent and Local 439; the fact that it was an employee who sought the election after speaking with other employees; the fact that the voting was by secret ballot; the lack of evidence that any substantial number of employees knew of the assistance lent by respondent in arranging for the election; the fact that the Association was formed and administered wholly by the employees, with the employees' funds, on the employees' time, and off respondent's premises; the fact that the Association actively carried on contract negotiations with respondent—all of these circumstances, considered together, indicate that the formation and administration of the Association were not, in any sense, inspired, dominated or controlled by respondent. The record as a whole, we think, is consistent only with the conclusion that the employees formed and supported the Association freely, of their own volition, and in what they thought were their best interests. Cf. Wayside Press, Inc., v. N.L.R.B., supra.

The preference given organizers of the Association over organizers of Local 439 in assistance and in the use of respondent's premises constituted employer interference with the organizational efforts of two labor organizations, neither of which was "dominated" by the employer. As stated above, there is no warrant in such a case for an order directing the disestablishment of the favored and victorious union and prohibiting the employer from ever again recognizing it as his employees' bargaining agent. See N.L.R.B. v. Braswell Motor Freight Lines, supra. Nor was the execution of the bargaining agreements containing technically illegal union security provisions grounds for such an order. Cf. N.L.R.B. v. Gaynor News Co., supra. The order should go no further than to require respondent to withdraw

and withhold recognition from the Association unless and until the Association is certified by the Board after a representation election. See N.L.R.B. v. Braswell Motor Freight Lines, supra.

The Board's order will be amended as follows:

(1) Paragraph 1(a), requiring respondent to cease and desist from dominating or interfering with the administration of the Association or contributing support to it shall be amended so as to require only that respondent cease and desist from "contributing support to the Association or any other labor organization;"

(2) To paragraph 1(b), directing respondent to cease and desist from recognizing the Association, shall be added the words "unless and until the Association shall be certified as the collective bargaining representative of respondent's employees by the National Labor Relations Board;"

(3) Paragraph 1(c), requiring respondent to cease and desist from giving effect to any and all contracts with the Association, shall be amended so as to require respondent to cease and desist from "entering into or giving effect to any contract with the Association or any other labor organization which shall contain union security provisions not in conformity with § 8(a)(3) of the National Labor Relations Act, as amended;"

(4) Paragraph 1(d), containing a blanket prohibition against respondent's interfering with, restraining or coercing his employees in the exercise of any of the rights guaranteed in § 7 of the Act, shall be amended so as to require only that respondent cease and desist from "in any manner interfering with, restraining or coercing his employees in the exercise of the right to self-organization, to form, join, or assist International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Local No. 439, AFL, or any other labor organization;"

(5) Paragraph 2(a), directing respondent to withdraw and withhold recognition from and completely disestablish the Association as the representative of his employees shall be amended by striking therefrom the words "and completely disestablish" and by adding at the end of that paragraph the words "unless and until the Association shall be certified as the collective bargaining representative of respondent's employees by the National Labor Relations Board;"

(6) There shall be added to the order by the decree the following: "Nothing in this decree shall authorize the Board to arbitrarily refuse to certify the Association as representative of respondent's employees or prevent the employer from recognizing the Association if it is freely chosen by its employees and if the Board unreasonably refuses it an opportunity by an election or otherwise to obtain certification." See N.L.R.B. v. Braswell Motor Freight Lines, supra.

Appropriate textual changes will be made in the order to conform with the amendments above directed.

As thus modified, the Board's order will be enforced.