**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**PRINCE MACARONI MANUFACTURING CO., Respondent.**

No. 6171.

United States Court of Appeals
First Circuit.
March 31, 1964.

---

3. 55 Am.Jur., Vendor and Purchaser § 733.

4. Commonwealth v. Kelly, 1936, 322 Pa. 178, 185, 185 A. 307, 310; Wilkin v. Shell Oil Co., 10 Cir. 1951, 197 F.2d 42, 49; 34 Am.Jur. Lis Pendens § 22; 54

C.J.S. Lis Pendens § 1; American Law of Property, Vol. III, § 13.12, Vol. IV, §§ 17.11, 18.84.

5. H. Abraham & Son v. Casey, 1900, 179 U.S. 210, 21 S.Ct. 88, 45 L.Ed. 156; 34 Am.Jur., Lis Pendens, § 12.

Allison W. Brown, Jr., Attorney, Washington, D. C., with whom Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Stuart Broad, Attorney, Washington, D. C., were on brief, for petitioner.

William F. Joy, Boston, Mass., with whom John J. Desmond, III, and Morgan, Brown, Kearns & Joy, Boston, Mass., were on brief, for respondent.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

This is a petition of the National Labor Relations Board for enforcement of its order issued against respondent on September 26, 1962 following the usual proceedings under the Act. The Board, in adopting the opinion of its trial ex-

aminer, found that respondent had discriminated with respect to the hire and tenure of one of its employees in violation of Section 8(a) (3) of the Act and had violated Section 8(a) (1) by interrogating the same employee, making threatening, anti-union declarations, and creating an "impression of surveillance." The Board agreed with the trial examiner that respondent assisted, supported and interfered with the administration of an Employees' Committee in violation of Section 8(a) (2) and (1) and further found that the facts detailed in the Intermediate Report established domination of the Committee by respondent.

Respondent, a Massachusetts corporation, is engaged at Lowell in the manufacture, sale and distribution of macaroni, spaghetti, noodles and related products. Early in 1961 Local 2, Amalgamated Meat Cutters & Butcher Workmen of North America, AFL-CIO (hereinafter called the Union), started to organize respondent's approximately 165 employees. By the beginning of April many of respondent's supervisors and officials, including its president, Joseph Pellegrino, knew of such activity.

The record discloses that about April 10, 1961 employee Esther Hibbard, the charging party, had a conversation with president Pellegrino in the office of the plant manager. Hibbard had been commenting on the rumors she had heard that if a union came in Pellegrino would resign, and was requested to see the president by her forelady, Angela Dirubbo. While the plant manager was there, Pellegrino asked Hibbard what her problems were. She replied that she and the employees felt insecure because they were not assigned definitely to a particular job. Pellegrino promised to look into this. He then denied the two rumors Hibbard claimed to have heard from employees that he would leave as president if the Union came in, and that the plant would close the week of July 4 for the construction of a new roof. A few moments later, after asking the plant manager to leave, he asked Hibbard in confidence to disclose the names of the employees who

told her the rumors; she declined. Hibbard testified that Pellegrino then asked her how she felt about a union and her reply was that she was a union girl and that her husband was in the MTA union. Pellegrino denied that he asked this question.

A day or two later, Irving Appel, a director of respondent and general manager of its subsidiary, Cleghorn Folding Box Co., came to Hibbard's work bench. Appel testified that he visited the plant about twice a month and often spoke to the employees. After conversing a few moments with Hibbard, and with forelady Dirubbo's permission, he invited Hibbard to the coffee shop. There, after Hibbard told him of her dissatisfaction in not having a specific job to go to every morning, she admittedly brought up the subject of the Union and stated that her husband was in the MTA union. She testified that Appel asked her how she felt about the union and she replied that she was for it; that Appel then stated there were good and bad unions and offered to take her and her husband to Florida to "prove the new cars the unions run around in." Appel denied asking these questions.

On or about June 26 Catherine Monson, respondent's personnel director, called Hibbard to her office and stated that she was aware that Hibbard was telling some of the employees that the company was not going to pay employees for the July 4 holiday. She told Hibbard that this was not true and warned her not to spread any more false rumors. Hibbard testified that she asked Monson if she had been called to Monson's office "because of the union," and that Monson had replied that "we know there were 12 girls over at the diner and that you are to have a union meeting in Lowell at 8 o'clock Tuesday night."[1] Hibbard further testified that Monson asked her who among the girls were for the Union and that she refused to name them, although Monson repeated the question. She testified that Monson then told her that she was being a "goat for the company and the union mixed in" and that she would get into a lot of trouble and would not benefit by it. Monson denied making these latter statements but the examiner found the facts to be as testified to by Hibbard.

In the latter part of June, president Pellegrino spoke to an assembly of his employees to squash the rumor concerning the July 4 holiday pay. In his talk Pellegrino told the employees that the rumor was not true. He also told of another rumor spread by the same person concerning the salary paid the gardener's helper which, he claimed, was likewise untrue. He then stated that there was one person who was a representative on the Employees' Committee and also representing a union and that "no person can serve two gods." He said that he could fire this person but that he would not because he wanted to be fair. He then spoke of how he always tried to do the best he could for his employees.

■ The Board found the above described incidents to have established respondent's violation of Section 8(a) (1) of the Act. The respective questioning of Hibbard by Pellegrino, Appel and Monson[2] were each found to be coercive.

1. Hibbard, along with 12 to 15 other employees, had met with the Union at the diner during their lunch hour.

2. The trial examiner found that Monson's questioning amounted to unlawful interrogation although it was not pleaded as a violation in that section of the complaint and came into evidence on the issue of whether respondent had created an "impression of surveillance." The complaint, however, informed respondent that the confrontation between Monson and Hibbard would be the basis of the surveillance charge. The matter was fully litigated at the hearing and it was as much in the interest of respondent's defense to the surveillance charge as it was to the unlawful interrogation charge to impeach or mitigate Hibbard's testimony on this point. Respondent is thus unable to show that it was prejudiced in presenting a defense on this point. N. L. R. B. v. Puerto Rico Rayon Mills, Inc., 293 F.2d 941 (1st Cir. 1961). See N. L. R. B. v. Johnson, 322 F.2d 216 (6th Cir. 1963); Bakery Wagon Drivers & Salesmen, Local U. No. 484 v. N. L. R. B., 321 F.2d 353 (D.C.Cir. 1963).

Monson's statement was found to have created an "impression of surveillance" and Pellegrino's speech was found to contain a threat of discharge for union activities.

The interrogations of Hibbard by Pellegrino and Appel, standing alone, cannot be considered that type of questioning which the Act proscribes. National Labor Relations Board v. England Bros., 201 F.2d 395 (1st Cir. 1953); Sax v. National Labor Relations Board, 171 F. 2d 769 (7th Cir. 1948). "The coercive effect of the language used should be determined by the entire factual context in which it is spoken." National Labor Rel. Bd. v. Armco Drainage & Metal Prod., 220 F.2d 573, 583 (6th Cir. 1955). In both instances Hibbard spoke freely of her union sympathies and was in no way intimidated by her questioners. The questioning by Monson, however, could be construed as coercive, especially in the light of Monson's warning, following Hibbard's refusal to name employees supporting the union, that Hibbard's union activities would "get [her] involved in a lot of trouble." See Lloyd A. Fry Roofing Co. v. National Labor Rel. Bd., 222 F.2d 938 (1st Cir. 1955). Further, Monson's disclosure to Hibbard that she knew how many employees had attended a recent union meeting and knew when another meeting was scheduled, stating the time and place, allowed the Board to find a deliberate attempt on respondent's part to cause Hibbard to believe that her union meetings were being kept under surveillance. N. L. R. B. v. New England Upholstery Co., 268 F.2d 590 (1st Cir. 1959); National Labor Relations Bd. v. Swan Fastener Corp., 199 F.2d 935 (1st Cir. 1952).

Respondent contends that Pellegrino in his speech obviously meant that he could fire the person mentioned[3] because of her role in spreading the rumor concerning July 4 holiday pay and that the "serving of two gods" admonition meant merely that the person should not remain a Committee member if she was going to work for the Union. However, the testimony of at least three employees other than Hibbard showed that they understood the firing threat to be directly related to the warning about "serving two gods." As such, it was plainly coercive and threatening within the meaning of the Act. N. L. R. B. v. New England Upholstery Co., supra. The statement that Pellegrino would not fire such a person because he wanted to be fair was properly found not to have removed the coercive effect that he could do so. The entire speech served to put the employees on notice that their jobs were in jeopardy if they performed roles similar to Hibbard's.

We, therefore, uphold the Board in its finding that respondent violated Section 8(a) (1) of the Act and its order related to that violation will be granted enforcement after it is revised to conform to the views discussed *infra*.

Denied enforcement, however, is the Board's order relating to respondent's alleged violation of Section 8(a) (3) by its discharge of employee Hibbard. "The finding of 8(a) (1) guilt does not automatically make a discharge an unlawful one or, by supplying a possible motive, allow the Board, without more, to conclude that the act of discharge was illegally inspired." National Labor Relations Board v. McGahey, 233 F.2d 406, 410 (5th Cir. 1956). "It is well accepted law that an employer may discharge an employee for any reason, reasonable or unreasonable, so long as it is not for a reason prohibited by the Act." National Labor Rel. Bd. v. Standard Coil Products Co., 224 F.2d 465, 470 (1st Cir.), cert. denied, 350 U.S. 902, 76 S.Ct. 180, 100 L.Ed. 792 (1955). The burden is on the Board to prove affirmatively by substantial evidence that Hibbard's discharge was motivated by respondent's desire to deprive her of her section 7 rights. National Labor Rel. Bd. v. Standard Coil Products Co., supra.

---

3. Pellegrino admitted that he had Hibbard in mind and the evidence discloses that the employees were aware that the person being discussed was Hibbard.

Esther Hibbard was fired by respondent for violating Rule 15 of respondent's Plant Rules. The Rules were drawn up by respondent and the Employees' Committee and are contained in a booklet given to each employee upon being hired. Rule 15 prohibits an employee from "Threatening, intimidating, coercing, or interfering with fellow employees or supervision on the premises at any time." The charge is "Subject to Review of Facts" which requires a meeting of the Employees' Committee and the accused's supervisor in the presence of the accused employee. "This meeting must be held within twenty-four hours following the infraction of rules. The penalty may range from reprimand to discharge." The responsibility for enforcing the rules resides in management.

Hibbard testified that on September 7, 1961 forelady Dirubbo asked her if, as a member of the Employees' Committee, she would watch the work performance of three girls, Judy Yandow, Glenna Morin and Rita Wynn, so that "when they are brought before the Committee to be fired, you will know the reason and hold no hard feelings about it." Hibbard refused, answering that observing employees was a proper function only of management. She nevertheless agreed to speak to the employees. The same day Glenna Morin asked her to talk to Dirubbo to see what she could do about getting Morin transferred from the box machine at which she was then working.

Hibbard testified that a few days later she told Morin that she had spoken to Dirubbo and that Dirubbo said Morin would be transferred as soon as a new boy was hired to do this work. In the meantime, she told Morin, "If the work is too much, you don't have to kill yourself but do your work; take your time and do your work but do it right and do it so there will be no complaints."

She further testified that she spoke to Yandow that day admonishing her for "goofing off" and not doing her work. She reminded Yandow that Yandow and another girl were hired to take the place of two girls who had been fired; that the plant did not "hire very often;" that the girls who were fired were making the full amount; that it was cheaper for respondent to fire girls making top pay for girls who are not working.

Morin and Yandow denied Hibbard's account of the foregoing events. Morin testified that Hibbard told her only to slow down on the boxes and take her time and in that way she would have to be taken off the job. This version of the incident was corroborated by Yandow who testified that "We were sitting downstairs, and Glenna told Esther she couldn't keep up with the boxes and she didn't like her job. So Esther told her just to take her own time and go slow and that way Angie would have to take her off." As for herself, Yandow testified that Hibbard had told her that she would be fired, mentioning respondent's policy of hiring cheaper girls as one of the reasons.

Monson testified that Yandow came to her office the following day, Saturday, and disclosed what Hibbard had told her. Yandow was very upset and protested that as she was getting married she could not afford to lose her job. Monson told Yandow to go home and think over what she had just told Monson and if she still felt the same way Monday, to come in and something would be done about Hibbard's statement. On Monday, September 11, Yandow was called down to Monson's office and asked to repeat her story to Dirubbo. Monson then asked Yandow whether, if she wrote some of the story down, Yandow would sign it and back it up. Yandow replied that she would "as long as there was no trouble." Vice president and acting plant manager Meicke was then called in and Yandow repeated her story to him. The statement signed by Yandow is as follows:

"Friday, Sept.-8-1961 Esther Hibbard told me that if I said anything about being dissatisfied,—because the supervisor spoke to me—I would be turned in and *fired*. She said that during this time we let people go so that we may hire in others at a

lower rate. That is how Prince gets their cheap labor. She also said that even though I had left a message for Kay that the Supervisor would not deliver the message.

(Signed) Judith Yandow." [4]

Also, on September 11, Monson testified she called Morin down to her office. After discussing Morin's work performance, Monson told her that she was aware that Hibbard had suggested to her that she slow down in order to be taken off the box machine. Morin was surprised that Monson had this information but admitted that it was true. Monson then wrote the information down, "asked me if I would read it over and sign it, and I said yes and I read it and signed it." The signed statement is as follows:

"Sept 11, 1961 Did Esther Hibbard make this statement—that you should take your time moving boxes —so that you would be taken off as box maker? Yes—Glenna Morin. [The words 'Glenna Morin' are in Morin's handwriting.]"

On either September 11 or 12 Meicke spoke to both Morin and Yandow regarding their accusations against Hibbard. Dirubbo was present at this conversation. After the conversation Meicke decided that Hibbard should be discharged, but that the Plant Rules would be followed and Hibbard would be given a hearing. Meicke was not bound by the Employees' Committee's determination although, he testified, he would take their view "into consideration in making the decision."

The Committee meeting was held on September 12. Prior to entering the room, Monson asked Hibbard for an explanation of her conversation with Morin and Yandow. Hibbard gave her version of the talks.

Appearing before the eight remaining Committee members, Meicke accused Hibbard of violating Rule 15 and read off the two charges against her. Morin and Yandow were brought into the room and Monson read their statements to the Committee. Hibbard then spoke briefly in her defense, giving her version of the talks. Morin and Yandow, under questioning by Monson, both reaffirmed the truth of their signed statements. The Committee asked no questions of the witnesses. In response to a question from a Committee member, Meicke said that Hibbard was not being tried for union activities and the Committee was to judge the case only upon the evidence presented.

Hibbard, Dirubbo, Morin and Yandow were then asked to leave the room. Meicke recommended that Hibbard be discharged. The Committee told Meicke and Monson that it was not necessary that they leave the room during the vote. After a ten to fifteen minute discussion a vote was taken and the Committee unanimously agreed that Hibbard should be discharged. The vote of the Committee was then reduced to a typed document and signed by each Committee member and witnessed by Monson, Meicke and plant manager Giannini. This document was suggested by a Committee member in case Hibbard protested her discharge to the National Labor Relations Board. Hibbard was then recalled and told of her discharge.

The trial examiner apparently sought to meet the Board's burden of showing an improper motive for the firing of Hibbard by disposing of respondent's asserted reason for the discharge and listing a number of circumstances from which an improper motive could be inferred. Having in this manner concluded that the discharge was the result of Hibbard's union activities, he found it "unnecessary to comment on or analyze evidence relating to whether Respondent adhered to or departed from its usual practices in connection with the hearing on September 12 [or] whether legal cause existed for the discharge. * * *"

4. The last sentence refers to the fact that Monson was not in her office when Yandow first went to see her and Yandow left a note for the personnel director to call her when she came in. Yandow testified that Hibbard told her to give this information to Dirubbo or else Dirubbo would not deliver the message.

In the attempt to dispose of respondent's asserted reasons for the discharge, the trial examiner, in analyzing the charges against Hibbard concluded that each one was actually explainable in Hibbard's favor. His analysis on this point shows a complete acceptance of Hibbard's testimony with, at best, only a slight attempt to examine the conflicting testimony of at least five other witnesses. See N. L. R. B. v. Croscill Curtain Co. & Durham Drapery Co., 297 F.2d 294 (4th Cir. 1961). Thus, the examiner concluded that Hibbard told Morin only that she should not kill herself and cautioned her to do her work right; as such, he could not find it an "alarming statement." He was unable to "find that Hibbard told Yandow that the latter was going to be fired (although Yandow may have so inferred from Dirubbo's conversation with Hibbard brought to Yandow), or that she falsely represented to Yandow the Company's policy in hiring and firing." Faced with the same conflict of testimony on these points, all eight of the Committee members chose unanimously to believe Yandow and Morin.

The question before the trial examiner was not whether Hibbard actually made the controverted statements to Morin and Yandow, but whether respondent believed that she did when it fired her. Raytheon Company v. N. L. R. B., 326 F.2d 471 (1st Cir. 1964); N. L. R. B. v. Kaye, 272 F.2d 112 (7th Cir. 1959). The examiner did not find that there were no grounds for such a belief, nor could he so find. The possibility that a full scale trial may have· established Hibbard's story as the correct one does not alter the fact that Monson, Meicke, Dirubbo and eight members of the Committee believed Morin and Yandow to have told

the truth. Nothing in the record suggests why it would have been unreasonable for these people to hold that belief. The examiner's conclusion, therefore, that "Hibbard's statements to Morin and Yandow were seized upon as pretexts to release her" is unsupported by substantial evidence in the record, especially so since the examiner found it unnecessary to determine whether Hibbard's statements, if uttered according to respondent's view, would have violated Rule 15. Nor do the circumstances cited by the Board inferring an anti-union motivation for the discharge succeed in rendering unreasonable respondent's justification for the discharge.[5] See National Labor Relations Bd. v. Whitin Machine Works, 204 F.2d 883 (1st Cir. 1953).

We next come to the question of respondent's alleged domination of its Employees' Committee. The Employees' Committee was founded at the suggestion of president Pellegrino as a means of settling a strike in 1941. Following his suggestion, the strikers formed a group to represent them in discussing the strike with him. The group talked over with Pellegrino the grievances prompting the walkout and a written agreement was executed embodying the agreed upon adjustments. Pellegrino consented to the request of members of the group who stated that they would like to speak to him whenever "they had anything to take up with him," and as of then the group began to function as the Committee. It was thereupon given its present name and has existed ever since in the plant. It is not questioned that the Committee was lawfully established. Respondent admitted that the Committee is a labor organization within the meaning of Section 2(5) of the Act.

5. Circumstances relied on by the examiner included the following: (1) respondent's management discussed Hibbard and the union activity at the plant; (2) on at least one long distance phone call Meicke discussed Hibbard with Pellegrino who was out of town; (3) Appel's conversation with Hibbard about her union sentiment; (4) a meeting called by Pellegrino allegedly to neutralize Hibbard's organizing activities; (5) Hibbard was disliked by Dirubbo and foreman Desilets, the latter having suggested that she be fired for spreading false rumors around the plant; (6) Hibbard's work and performance was good while that of Morin and Yandow was bad.

The Employees' Committee is composed of about nine employee members, called representatives, who are elected by the employees. The elections are held about every six months with each department electing one or more representatives. Voting takes place during working hours on payday. With his paycheck each employee simultaneously receives a ballot made up and prepared by respondent from the foreman of his department. Each regular production employee is eligible as a candidate and his or her name appears on the ballot. Employees then deposit the completed ballots in the ballot boxes placed on the work tables in each department by the foreman. The foreman is in charge of these boxes which are fabricated at respondent's expense. The boxes then are sealed by the foreman and brought by each foreman to personnel director Monson; the latter directs some part-time clerical help who are not in the unit and who do not participate in the election, to count the ballots. No observers are present during the count. Results of the election are then posted on the bulletin board in each department by the plant manager's designee and at respondent's expense. It is the plant manager's responsibility to cause ballots to be prepared, circulated, counted, and to have results posted. No employees lose pay for the time taken during working hours to vote. By agreement between the Committee and respondent made recently (1) no Committee member may serve more than a year and (2) within the last year, the membership of the Committee has been increased.

The Committee has no officers, no treasury, no by-laws, and does not impose dues or initiation fees. Its functions are divided into two stages. In the first stage employees convey their grievances, complaints, suggestions or requests to a representative. It is not clear in the record how the representative transmits this information to the other members of the Committee as no meetings of the Committee alone have been held. At a later stage, the Committee meets with respondent's plant manager, during working hours, in respondent's conference room to discuss these matters with him. Personnel director Monson is also present. The plant manager presides at the meetings; either he or the personnel director often bring up subjects to be discussed with Committee members also free to raise any point for consideration. The record discloses that the Committee negotiated wage increases with management as well as job classification, although respondent has not executed a collective bargaining contract with the Committee since 1941. If some matters, not otherwise identified in the record, taken up at Committee meetings come to an "impasse" they are resolved on behalf of respondent by its president. The Committee also acts as an appellate body to review actual or recommended discharges of employees, although its recommendation is advisory only and need not be followed by respondent.

Minutes of the Committee meetings are made by the personnel director. They are typed at respondent's expense and posted on respondent's bulletin boards. Committee members lose no pay for time spent at meetings. The meetings with management are held monthly and notice is given to members of the Committee by their foremen.

The trial examiner found that the above stated facts established only that respondent assisted, contributed to the support of, and interfered with the administration of the Committee in violation of Section 8(a) (2) and (1) of the Act by "conducting, at its own expense, the election of members of the Committee." The Board agreed with these findings but in a footnote to its decision stated: "However, contrary to the Trial Examiner's conclusion, we find further that the facts detailed in the Intermediate Report, which accurately reflect the record, also establishes domination of the Committee by the Respondent, in violation of Section 8(a) (2)."

"The employer-employee relationship itself offers many possibilities for domination, which is one of the reasons for

the original enactment of the Wagner Act, but *actual domination* must be shown before a violation is established." Chicago Rawhide Mfg. Co. v. National Labor Rel. Bd., 221 F.2d 165, 167 (7th Cir. 1955). The trial examiner was unable to find such actual domination although he appreciated the fact "that the Committee is 'an inherently weak bargaining representative, and a feeble instrument for conducting bitter economic warfare, as contrasted with a union affiliated with a strong national labor organization.' (Magruder, C. J. concurring in Coppus Engineering Corp. v. N. L. R. B., C.A.1, 240 F.2d 564, 573.)"

We agree with the trial examiner that the facts do not disclose respondent's domination of the Employees' Committee. Although it meets only in joint sessions with management, according to the record the Committee does not lack in its ability to present to management proposals and positions independently arrived at. The Committee handles and adjusts with respondent not only individual employee grievances but grievances relating to wages, working conditions, benefits, vacations, and, in some instances, employee discharges. While the plant manager presides at the joint sessions, the record discloses no respondent control over the agenda and the representatives are free to bring up any complaint at the meeting. At one point, the complaints of employees were so numerous that the Committee was enlarged to include more representatives. The agreement between the Committee and respondent that the president be the final arbiter on certain matters is quite within the Committee's prerogative. There is no indication that the Committee was not an effective organ for advancing the interests of the employees and that the employees were not satisfied with its performance. Since the formation of the Committee in 1941 labor strife at the plant has been virtually non-existent. The use of purely objective standards in determining employer domination often fails to take into account the fact that employer domination, to a great extent, depends upon the state of mind of the employees. See National Labor Relations Board v. Wemyss, 212 F.2d 465, 471 (9th Cir. 1954).

Almost all of the other circumstances relied on by the Board as indicative of the Committee's subservience to respondent have been examined by the courts and found not to support the Board's contention: Committee members meeting on company time and property without deduction from compensation, Coppus Engineering Corp. v. National Labor Rel. Bd., 240 F.2d 564 (1st Cir. 1957); Chicago Rawhide Mfg. Co. v. National Labor Rel. Bd., supra; the failure to have executed written contracts reflecting the agreements reached between management and the Committee and the publication by the company of the minutes of the joint meetings, Hotpoint Co. v. N. L. R. B., 289 F.2d 683 (7th Cir. 1961); the Committee's lack of a source of revenue, Coppus Engineering, supra.

However, while employer domination is not evident on this record, we do agree with the trial examiner that respondent overstepped the thin boundary line between cooperation and support and interference by taking upon itself sole responsibility for organizing and supervising the election of Committee members. It is one thing to allow a labor organization to conduct elections on company time and company property, Chicago Rawhide, supra, and quite another thing for the company to hold the elections for the labor organizations. There is no evidence in the record to indicate that the elections were not conducted in a completely fair manner. But if the integrity of the secret ballot is to be safeguarded and the employees are to remain masters in their own house, it is essential that they alone conduct the elections of their representatives. Cf. National Labor Relations Board v. Bird Mach. Co., 161 F.2d 589 (1st Cir. 1947). In conducting the election for its employees, respondent has delegated to itself one of the most important functions in the administration of a labor organization. In regard to the Employees' Committee we,

therefore, reject the decision of the Board and uphold the view of the trial examiner.

In summary we hold (1) respondent has engaged in unfair labor practices within the meaning of Section 8(a) (1) of the Act by coercively interrogating one of its employees as to union activities; by causing one of its employees to believe that her union meetings were being kept under surveillance; by threatening employees with discharge if they engaged in union activities; (2) substantial evidence in the record does not establish respondent's violation of Section 8(a) (3) of the Act; (3) by assisting, contributing to the support of and interfering with the administration of the Committee, respondent has engaged in unfair labor practices within the meaning of Section 8(a) (2) and (1) of the Act.

█ Because the Board's order will have to be re-drafted, we shall retain our jurisdiction but return the case to the Board for revision of its order in accordance with the views expressed in this opinion. N. L. R. B. v. Kelly & Picerne, Inc., 298 F.2d 895 (1st Cir. 1962). In revising its order, the Board should bear in mind that in N. L. R. B. v. United Wire and Supply Corporation, 312 F.2d 11 (1st Cir. 1962), this court held that the Board's order requiring respondent to cease and desist from giving the "impression of surveillance" to employees was too broad, and that the order ought to "set out the conduct which it asserts creates an 'impression' of surveillance and forbid those acts and like or related conduct." Also, the Board's order to respondent to cease and desist from "in any other manner interfering with, restraining, or coercing its employees in the exercise of the rights guaranteed in Section 7 of the Act" is too broad. The Board concedes that this paragraph of the order was primarily based on respondent's alleged violation of Section 8 (a) (3). The order should now be limited to the unlawful conduct in issue before the Board. Cf. N. L. R. B. v. Thompson Ramo Wooldridge, Inc., 305 F.2d 807 (7th Cir. 1962).