**NATIONAL LABOR RELATIONS BOARD v. SEVEN-UP BOTTLING CO. OF MIAMI, Inc.**

No. 13714.

United States Court of Appeals, Fifth Circuit.

April 29, 1952.

Rehearing Denied June 18, 1952.

Mozart G. Ratner, A. Norman Somers, Assts. Gen. Counsel, Washington, D. C., for petitioner.

Frank A. Constangy, Atlanta, Ga., Albert B. Bernstein, Miami, Fla., for respondent.

Before HOLMES, BORAH, and STRUM, Circuit Judges.

STRUM, Circuit Judge.

This is a petition to enforce, and a cross petition to set aside, an order of the National Labor Relations Board, issued January 30, 1951, pursuant to Sec. 10(c) of the National Labor Relations Act, as amended, 29 U.S.C.A. 160(c). The order requires respondent to bargain with a designated union as the representative of respondent's driver-salesmen, to reinstate with back pay certain of said employees which the Board found had been discriminatorily discharged because of Union activities, and to post the usual notices of compliance.

The Board's order rests upon findings that respondent violated Sec. 8(a) (1) and (5) of the Act by refusing to bargain with the Union as the exclusive representative of respondent's driver-salesmen, thereby precipitating a strike, and that by rejecting the strikers' request for reinstatement respondent, in violation of Sec. 8(a) (1) and (3) of the Act, discriminated against them because of their union activities, and was therefore guilty of unfair labor practices.

Respondent challenged the Board's jurisdiction on the ground that its activities do not affect interstate commerce, but are essentially local. It also defended upon the grounds that the company official upon whom the Union representative made his demand to bargain, was not authorized to represent the company in such matters; that the company's refusal to bargain was not unlawful, and that it was under no obligation to reinstate the strikers because their request therefor was conditional.

Respondent, a Florida corporation, bottles and distributes a soft drink in the Miami area. The business was incorporated on April 1, 1948, prior to which time it had been operated by A. J. Tobin as sole proprietor. The corporate stock was issued, 50% to A. J. Tobin, 25% to his wife, and 25% to their son, Sherman Tobin. A. J. Tobin, however, was the dominant figure in the corporation, and determined its policies. Tobin, Senior, became seriously ill, and upon the advice of his physician went to New York for medical treatment, to be away for about two months. He was accompanied by his wife. During their temporary absence, they left the business in charge of the son, Sherman Tobin, a young man about 24 years old, who was secretary-treasurer of the company, but who was inexperienced as to the executive and labor policies of the company.

During the absence of Tobin, Senior, and his wife, one John J. Lunin, secretary-treasurer and business manager of a local A. F. of L. Union, demanded of young Sherman Tobin that respondent recognize said Union as bargaining representative of the driver-salesmen, claiming a majority representation of these employees. Young Tobin advised him that he had no authority to make decisions as to policies of plant operation, that he did not think the Union was a good thing for the driver-salesmen, and requested that Lunin await the return of Tobin, Senior, to Miami within a few weeks. He also expressed doubt that the Union represented a majority of said employees. Several requests were made by Lunin upon young Tobin that the latter recognize the Union, but Tobin adhered to his refusal.

At a Union meeting held the latter part of August, 1948, Lunin reported to the drivers that young Tobin had flatly refused to recognize the Union. Thereupon, about September 7, 1948, all but two of the drivers went out on strike, after appearing at the company's plant in a body, accompanied by Lunin and one Reilly, president of the Union, and delivering to young Tobin an ultimatum that unless he immediately recognized the Union they would strike. Tobin declined, and the strike went into effect.

Young Tobin thereupon recruited and trained new employees to replace the strikers, and within about a week had the sales trucks operating again, which broke the strike. The former employees then offered to return to work, without recognition of the Union, and let the Labor Relations Board settle the controversy, but respondent declined to reinstate them. Thereupon a complaint against respondent, charging unfair labor practices, was filed by the Union, which complaint culminated in the order now under consideration.

We agree with the Board that the employees' proposal that they return to work and await a determination of the controversy by the Board did not impose an objectionable condition upon their offer to return to work.

Respondent's challenge to the Board's jurisdiction is not well taken. The Board found, and the evidence shows, that while respondent's product is manufactured and all sales made within the State of Florida, it annually imports from states other than Florida raw materials and other supplies valued at more than $82,000, and these materials represent more than 60% of respondent's total purchases. On these facts, respondent is clearly subject to the Act, as the Board found. Imports, as well as exports, constitute interstate commerce within the meaning of the Act. If the flow of commerce is obstructed by labor disputes, it makes no difference in principle whether the interference is with the inward or outward movement of goods. Commerce is affected in either case. Collins Baking Co. v. N. L. R. B., 5 Cir., 193 F.2d 483. Moreover, respondent is an affiliate of a group of manufacturers of this product in numerous States, operating under a franchise granted by the parent firm in St. Louis, Missouri. The product is marketed under a nationally advertised trade-mark.

It would have been much more consistent with fair play, had the Union representative awaited the return of Tobin, Senior, respondent's chief executive and policy-making officer, whose absence was only temporary, rather than pressing his demands, involving a fundamental and far-reaching executive and labor policy, upon

an inexperienced young man temporarily in charge. But these are matters for the Board to consider with the other facts involved.

Notwithstanding the precipitancy of the Union's demands, the fact remains that the business had been left in charge of young Tobin, and he was temporarily operating it. Although he was young and inexperienced, he was a 25% stockholder, and an officer of the company. While young Tobin protested he had no authority to grant the Union's demand, and questioned the Union's majority representation, he also stated that he opposed the organization of the driver-salesmen, was determined not to recognize or deal with any Union in their behalf, that he would fight the strike, and did not want to have anything to do with the Union. It was for the Board to determine upon the evidence which of these reasons actually motivated him in declining to deal with the Union. The Board adopted the trial examiner's finding that young Tobin refused to recognize the Union because of his opposition to it rather than because of the absence of his father.

■ This court has recently held that where there is evidence from which conflicting inferences may be drawn, the court will recognize the function of the Board as the trier of the facts, and will not disturb the Board's findings where, as here, they are supported by substantial evidence upon a fair appraisal of the whole record. N. L. R. B. v. Russell Mfg. Co., 5 Cir., 191 F.2d 358.

■ We agree with the Board that the employees covered by the order of January 30, 1951, are entitled to reinstatement with back pay, but we differ with the Board as to the method of computation.

Prior to its decision of June 12, 1950 in the Woolworth case, 90 N. L. R. B. 289, the Board awarded the employee a sum equal to what he would have normally earned over the entire period of suspension, less his actual net earnings in other employment during that entire period. Beginning with the Woolworth case, however, the Board requires back pay to be computed on a quarterly basis, each quarter standing upon a segregated basis. That method was ordered here.

Respondent objects to the latter method, asserting that since excess earnings by the employee in one quarter do not operate to offset deficiencies in the earnings of another quarter, it would frequently result that the suspended employee would receive more in back pay, computed on that basis, than he would have earned in uninterrupted employment.

The Board justifies its new method of computation upon the ground that employers have sometimes deliberately refrained from offering reinstatement to employees earning higher wages with another employer, because they knew that the greater the delay, the greater would be the reduction in their back pay liability. Thus, says the Board, a recalcitrant employer may profit by continuing to withhold reinstatement from a Union adherent who is then earning more with a new employer than he received from the old. Moreover, says the Board, suspended employees who are receiving higher pay from another employer, and who are therefore faced with the prospect of steadily diminishing back pay from their former employer, have thus been induced to waive their right to reinstatement in order to stop the running of back pay, and thus preserve the amount then owing them.

■ Whatever method of computation is used, there will be occasional hardship cases one way or the other, but these exceptional cases should not determine the rule. The ordinary case should be the criterion. The employee is entitled to be made whole, but no more. The employees here involved were not compensated on a quarterly basis. We see no sufficient reason to so compute their back pay during suspension. When a hardship case arises, it can be decided on its own facts. It does not appear that these employees will not be made whole by computing their back pay continuously over the whole period of their suspension, the method followed by the Board itself prior to the Woolworth case. We hold such method, rather than the quarterly method, should be followed here. There is nothing to indicate

**428**

that the conditions apprehended by the Board in the Woolworth case, exist here.

With that exception, the Board's order under consideration is

Enforced.