## NATIONAL LABOR RELATIONS BOARD v. SAXE–GLASSMAN SHOE CORP.

### No. 4658.

United States Court of Appeals
First Circuit.

Jan. 12, 1953.

Rehearing Denied Feb.·17, 1953.

Sidney A. Coven, Boston, Mass. (George J. Bott, General Counsel, David P. Findling, Associate General Counsel, A. Norman Somers, Assistant General Counsel, and Elizabeth W. Weston and Nancy M. Sherman, of Washington, D. C., on the brief), for petitioner.

Maurice Epstein, Boston, Mass. (Benjamin E. Gordon and Gordon & Epstein, Boston, Mass., on the brief), for respondent.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

HARTIGAN, Circuit Judge.

The National Labor Relations Board, pursuant to the National Labor Relations Act, as amended, 61 Stat. 136, 29 U.S.C.A. § 151 et seq., has petitioned this court for enforcement of its order of December 10, 1951, under § 10(c) of the Act, against the respondent Saxe-Glassman Shoe Corporation.

The respondent is a Maine corporation and is engaged in the manufacture of women's shoes in Saco, Maine. It concedes that it is engaged in commerce within the meaning of the Act.

In proceedings instituted by United Shoe Workers, CIO (hereinafter called the Union) the Board found that respondent attempted to prevent its employees from organizing under the Union's auspices by resorting to unfair labor practices forbidden by §§ 8(a)(1), (2) and (3) of the Act: surveillance of the employees' union activities, espionage, interrogation and other intimidatory tactics; discrimination against union adherents; and domination of a company-sponsored labor organization. In addition, the Board found respondent violated §§ 8(a)(5) and (1) of the Act by refusing to recognize and deal with the Union even

after it had been certified as the employees' statutory bargaining agent in consent election proceedings.

The consent election, the proper conduct of which was duly certified by agents of the Regional Director, was held on October 11, 1950. On November 20, 1950, the Regional Director filed his report on objections made by respondent to the conduct of the election and certified the Union as the exclusive representative of all the employees in the unit.

The trial examiner issued his intermediate report on July 31, 1951, finding that respondent had engaged in these unfair labor practices and recommended that it cease and desist therefrom and take certain affirmative action.

The Board considered the intermediate report and the entire record and, after finding the violations of §§ 8(a)(1), (2), (3) and (5) already referred to, issued the remedial order now before us. This order required the respondent to cease and desist from refusing to bargain with and from discouraging membership in the Union; from dominating, interfering with, assisting or recognizing the labor organization known as the Open Door Committee, and from interfering with, restraining, or coercing its employees in the exercise of the rights guaranteed to them by § 7 of the Act. Furthermore, respondent was ordered to bargain collectively with the Union upon request; to make whole four employees for any loss of pay each suffered by reason of the respondent's discrimination against them, in the manner provided by the remedy in the Intermediate Report, and to withdraw all recognition from the Open Door Committee as the bargaining representative of any of its employees and to completely disestablish it as such representative.

The respondent's refusal to bargain is based upon its insistence that the Union secured its selection by acting improperly in intimidating the employees. This point was raised initially before the Regional Director, who investigated the claim without any hearing, as he was allowed to do by the terms of the agreement for consent election.

The Regional Director reported that the respondent's objections were without merit.

■ When the respondent complained to the trial examiner concerning the Regional Director's denial of a hearing on this question, it was pointed out that respondent, in the agreement for consent election, had expressly waived any right to hearing. Furthermore, both the trial examiner and the Board maintained that respondent was not entitled to a review on the merits of the decision that the election was proper. A consent agreement provision that the Regional Director's "decision shall be final and binding" is, in the Board's view, a limitation on review, so that, in consent elections, only arbitrary and capricious actions of a Regional Director may be reviewed. This policy of the Board in consent election cases has received judicial approval. Labor Board v. A. J. Tower Co., 1946, 329 U.S. 324, 67 S.Ct. 324, 91 L.Ed. 322; National Labor Rel. Bd. v. General Armature & Mfg. Co., 3 Cir., 1951, 192 F.2d 316, certiorari denied 1952, 343 U.S. 957, 72 S.Ct. 1052.

In National Labor Relations Board v. Capitol G. Lines, 6 Cir., 1944, 140 F.2d 754, 758, certiorari denied, 1944, 322 U.S. 763, 64 S.Ct. 1285, 88 L.Ed. 1590, the court, after quoting with approval the Board's statement that the director's determinations had the same finality as an arbitrator's award, stated:

"This rationalization seems consistent with decisions of the Supreme Court. See Virginian R. Co. v. System Federation, 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789; Red Cross Line v. Atlantic Fruit Co., 264 U.S. 109, 119, 121, 44 S.Ct. 274, 68 L.Ed. 582.

"No valid reason appears and no authority has been cited which would justify a United States Court of Appeals to assume the role of super-canvassing board in a labor-bargaining-agency election."

■ Respondent contends that even if it is not entitled to a review on the merits of the Regional Director's denial of its ob-

jections to the conduct of the election, nevertheless it was entitled to some sort of a hearing before the Director. The respondent asks us to read narrowly the provision in the agreement for consent election that the "method of investigation of objections and challenges, including the question whether a hearing should be held in connection therewith, shall be determined by the Regional Director, whose decision shall be final and binding." The express reference in this agreement to the finality of the Director's determination of whether or not to hold a hearing was not contained in the agreement which was before the court in National Labor Relations Board v. Sidran, 5 Cir., 1950, 181 F.2d 671, where it was held that the Director had been arbitrary and capricious in denying challenges without a hearing. Thus the Sidran case upon which the respondent relies, is clearly distinguishable.

We are not warranted in disregarding the parties' agreement that the Regional Director shall investigate objections and challenges with or without a hearing. A narrow interpretation of the word "hearing" which respondent urges, would thwart the utility of the device of consent elections. These agreements are aimed at the expeditious settlement of election disputes. The parties are protected from any unruly action of the Regional Director by their right of review on an allegation of arbitrary or capricious conduct. The trial examiner "agreed to hear any and all evidence the Respondent might care to produce showing any arbitrary and capricious action by the Regional Director in reaching this decision." In the absence of such conduct, they have agreed to rely on the integrity and competence of the Director and we see no reason for disturbing the arrangement by narrow construction. The respondent has not questioned the integrity or the competence of the Director in this case and, furthermore, it expressly withdrew any claim that the Director was arbitrary and capricious.

Now for the first time, respondent objects that at least it should have been given access to the report of the field examiner designated by the Regional Director to investigate respondent's charges as to the conduct of the election, or to the evidence upon which the Regional Director based his conclusion, contrary to respondent's affidavits, that the election was fairly conducted—otherwise respondent would not be in a position to determine whether the Regional Director acted arbitrarily and capriciously, and the right accorded by the trial examiner to produce evidence of arbitrary and capricious action would be an empty and meaningless gesture. But respondent, in its petition for reconsideration filed with the Regional Director, made no request for a disclosure of the field examiner's report or of the other factual basis upon which the Regional Director acted, but rather, asked the Regional Director to give a full de novo public hearing on the charges as to the conduct of the election, a hearing to which respondent was not entitled, under the terms of the consent election. Thereafter, on appeal to the Board from the Regional Director's denial of such hearing, respondent did not ask for a disclosure of the evidence upon which the Regional Director acted, but asked the Board to order the Regional Director to conduct a full public hearing on respondent's objections to the conduct of the election. And when the unfair labor practice complaint came on for hearing before the trial examiner, respondent again made an effort to obtain a hearing upon the merits of its objections to the conduct of the election. In its exceptions to the trial examiner's report, respondent merely entered a general objection to that portion of the trial examiner's report reading as follows:

"In the absence of arbitrary and capricious action by the Regional Director in determining challenges and objections to the election, this provision of the agreement precludes appeals from both the Regional Director's decisions on the merits of the objections as well as to his determination of the methods of investigation of those claims. When, therefore, the Respondent during the hearing withdrew its original contention that the actions of the Regional Director had been arbitrary and capricious in arriving at his

242

judgments both as to the merits of the objections and to the method used for the investigation of those contentions, there remained nothing appealable to nor determinable by the undersigned."

This particular objection not having been "urged before the Board" is not open for consideration in this court, as provided in § 10(e) of the Act, 61 Stat. 148.

We find no merit in respondent's contention that a literal construction of the agreement jeopardizes his statutory right to a review of the record on the whole. That right is proper to ordinary fact findings of the Board. It has no application to the issue before us in this consent election case.

█ Thus, since we find that respondent was not entitled to a review on the merits of the Regional Director's determination that the consent election had been properly conducted, it is inescapable that the Board reasonably and properly found that respondent violated §§ 8(a)(1) and (5) by refusing to bargain with the certified representative of its employees. Not merely once, but on four separate occasions during the month following the Regional Director's certification, respondent denied written requests of the union to commence negotiations on the terms and conditions of employment.

█ It remains for us to determine whether substantial evidence on the record as a whole supports the Board's other findings of violations of §§ 8(a)(1), (2) and (3).

There is evidence in the record that plant manager Junior and foreman Newfield repeatedly interrogated various employees concerning their union activities and sympathies; that these same two men strongly intimated official company disapproval of a union and suggested that disagreeable consequences were likely to follow its election; that Joel Glassman, respondent's president, also interrogated many employees, individually or in small groups, in his office, and that during these private or semi-private interviews, he suggested his disapproval of the union. Three of the union organizers testified that he made threats

and promised them benefits if they would vote against the union or engage in anti-union activity. The record also shows that foremen of the respondent, together with anti-union employees, parked outside a union meeting hall, and after they had been requested to leave, returned again in another car. It was also testified that foreman Newfield, just after the election of the union on October 11, 1950, induced an employee named Lesante to attend union functions and use her acquaintance with one of the union organizers for the purpose of reporting on union activities.

Respondent seeks to avoid the effect of this evidence on the ground that the actions of its foremen were unauthorized and were in fact repudiated by the management. We do not agree with this contention. Nothing in the record indicates that the conduct was unauthorized and president Glassman's statement to one employee that he would "fix everything * * * even the firing to be done" after the election, is not a sufficient basis to compel the inference of repudiation which respondent urges. The statement itself is ambiguous and we do not see how it could have given any assurance to the emloyees as it was not communicated to all the employees generally. Cf. National Labor Relations Board v. Bird Mach. Co., 1 Cir., 1947, 161 F.2d 589. Moreover, even if Glassman had unequivocally stated his intention to discharge the supervisors sometime in the future, it would not seem to be a disavowal of responsibility for their conduct.

Therefore, we conclude that substantial evidence supports the Board's finding that respondent interfered with, restrained, and coerced its employees, in violation of § 8(a)(1) of the Act.

We also think the Board was justified in finding that respondent discriminated against four employees, Tremblay, Plessis, Gaudette, and Nadeau, because of their union membership and activity, in violation of § 8(a)(3) of the Act.

It appears that respondent knew that these four were union organizers; that they were all subjected to interrogation; that such interrogation caused one employee, Tremblay, to quit her employment.

The Board found, with respect to Tremblay, that this amounted to a constructive discharge and we think that the circumstances support this finding, especially since Tremblay's complaint to Glassman that foreman Newfield's harassment was affecting her health, received only the response that the situation would be corrected after the election. This was ample justification for the conclusion that Tremblay was forced to quit in the face of discriminatory treatment calculated to make her job unbearable. Cf. National Labor Rel. Bd. v. Palm Beach Broadcast. Corp., 5 Cir., 1946, 155 F.2d 805; National Labor R. Board v. East Texas Motor Freight Lines, 5 Cir. 1944, 140 F.2d 404. The Board also found that foreman Newfield's refusal to rehire Tremblay when she applied for work on December 19 was an independent act of discrimination. The only reason given for this refusal was that she had quit three months before, but since the record contains no evidence of company policy or precedent for this position, we think that under the circumstances here, the Board's conclusion was warranted.

Nadeau and Plessis were laid off October 4, one week before the election. There is evidence that although Nadeau was an experienced double needle stitcher, respondent selected her for layoff instead of an employee who was junior to her in service and was learning to operate the double needle machine. There was also evidence that, after unsuccessfully attempting to induce Nadeau to forsake the union, respondent hired new fancy stitchers without recalling her, although she was an experienced fancy stitcher and had repeatedly applied for work. With regard to Plessis, there is evidence that although respondent admittedly followed seniority in determining the order of recall following layoffs, she was not recalled until after the recall of several employees who were junior to her.

Gaudette, another avowed union supporter, was also denied reinstatement for about three weeks after the recall of the other fancy stitchers (except Plessis) who were affected by the October 4 lay-off. After being recalled on October 27 under the ad-

monition "not to talk too much," Newfield summarily discharged her on November 16, asserting as the ostensible reason that she had damaged four or five shoes. The evidence with respect to the nature of Gaudette's work as a stitcher, and the nature and sequence of the manufacturing operations performed on shoes after they had left the hands of the stitchers, makes it difficult to understand Newfield's alleged sudden discovery, at a late stage in the fabrication of these particular shoes, of defects in workmanship traceable back to Gaudette through at least three operations and one inspection. Newfield refused to listen to Gaudette's argument that she could not have been responsible for the damage to the shoes. Under the circumstances, the Board had sufficient basis to find that Gaudette was denied employment between October 13 and October 27, and then discharged on November 16, because of her union activities.

Respondent contends that even if the Board properly found that these four employees were discriminatorily discharged, the requirement in the Board's order that back pay be computed by calendar quarters is not authorized by law. We find no merit in this contention. We agree with the Third Circuit's opinion in National Labor Relations Board v. Kanmak Mills, Inc. (Kulpmont Manufacturing Co., Inc.,) 200 F.2d 542, where it was said:

"In its order the Board computed this employee's back pay on calendar quarters rather than on the entire period of discrimination considered as a unit. This follows the practice it initiated in F. W. Woolworth Co., 90 N.L.R.B. 289, 291 (1950). It is the result of the cumulative experience of many years by the Board in endeavoring to effectuate the statutory policy encouraging reinstatement of discriminatorily discharged employees. It is an expert effort to bring about ' * * * a restoration of the situation, as nearly as possible, to that which would have obtained but for the illegal discrimination.' Phelps Dodge Corp. v. N. L. R. B., 1941, 313 U.S. 177, 194, 61 S.Ct. 845,

244

852, 85 L.Ed. 1271. Ordinarily speaking this is a policy question for the Board's decision and it seems to us that, under the particular facts before us, the Board's conclusion should not be disturbed. Cf. N. L. R. B. v. Seven-up Bottling Co., 5 Cir., 1952, 196 F.2d 424, 427."

■ The only part of the order which remains to be considered. is that which deals with the company-sponsored employee organization known as the "Open Door Committee." This body which was to meet with management. weekly, was designed as a forum for the settlement of employee grievances. It consisted of representatives from each department of the plant, apparently chosen by the foreman, with provision for rotation of membership so that everyone who wished would have the opportunity to serve at some time. It appears that this group met with management twice, each time for one hour, and that the employees were paid for the time devoted to these meetings.

The Board found that respondent's participation in the institution and functioning of this committee was a violation of § 8(a)(2) and we think that there is substantial evidence in support of the finding. However, respondent objects to being ordered to take affirmative action in the form of withdrawing recognition and disestablishing the committee. Respondent says that since the committee no longer functions, this part of the remedial order is inappropriate. We fail to see why the Board should be powerless to correct this violation merely because the unlawful organization is dormant. This part of the order is appropriate to remedy the abuse found by the Board. Whether or not the committee's failure to meet more than twice, and whether or not its apparent suspension or dissolution renders unnecessary an order to take affirmative action, is a matter which Congress has left to the discretion of the Board under § 9(c) of the Act. Therefore, we think the order is an appropriate remedy for the violation of § 8(a)(2).

A decree will be entered enforcing the order of the Board.