419 F.2d 329
 71 L.R.R.M. (BNA) 2935, 136 U.S.App.D.C. 27
 RETAIL STORE EMPLOYEES UNION LOCAL 880, RETAIL CLERKS
INTERNATIONAL ASSOCIATION, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
KINTER BROTHERS, INC., Respondent, Retail Store Employees
Union Local 880, Retail Clerks International
Association, AFL-CIO, Intervenor.
 Nos. 21551, 21615.
 United States Court of Appeals District of Columbia Circuit.
 Argued Nov. 4, 1968.
Decided July 10, 1969.
 
 Mr. Joseph E. Finley, Cleveland, Ohio, with whom Mr. Melvin S. Schwarzwald, Cleveland, Ohio, was on the brief for petitioner in No. 21,551 and intervenor in No. 21,615.
 Mrs. Corinna Lothar Metcalf, Atty., National Labor Relations Board, with whom Messrs. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Gary Green, Atty., National Labor Relations Board, were on the brief, for respondent in No. 21,551 and petitioner in No. 21,615.
 Mr. Louis S. Belkin, Cleveland, Ohio, with whom Messrs. Thomas E. Shroyer, Washington, D.C., and Jeffrey A. Belkin, Cleveland, Ohio, were on the brief, for respondent in No. 21,615.
 Before BAZELON, Chief Judge, TAMM and LEVENTHAL, Circuit judges.
 LEVENTHAL, Circuit Judge:
 
 
 1
 This case brings to us an order of the National Labor Relations Board (NLRB), issued August 16, 1967, directing Kinter Bros. (Kinter), to bargain collectively with Retail Store Employees Union Local 880 (Union), to offer to reinstate certain employees found to be discriminatorily discharged, and to take other actions to remedy the effect of various other unfair labor practices. We find substantial evidence in the record to support the Board's findings, and grant enforcement of its order.
 
 
 2
 I VIOLATIONS OF SECTIONS 8(a)(1), 8(a)(3), 8(a)(4).[1]
 
 
 3
 The background is the classic struggle of a small unorganized enterprise to avoid organization of its employees. Kinter Bros. is a small retail grocery outlet in Mentor, Ohio, which regularly employs about twelve or thirteen people as cashiers, meatcutters, stockclerks, etc. In July, 1965, Joan Woc, a cashier, invited the Union to organize the Kinter employees. Woc spearheaded the campaign to obtain signatures on authorization cards. On July 16, 1965, the Union filed a petition for an election, and duly served a copy on Kinter. This petition was subsequently withdrawn. On October 25, 1965, the Union obtained another signature and, claiming to represent the majority of the employees in the bargaining unit, requested that Kinter recognize it as the representative of his shop employees.
 
 
 4
 Kinter was found by both the Examiner and the Board to have violated 8(a)(1) and 8(a)(3) on numerous counts both before and after the Union's demand for recognition. These violations included unlawful interrogation of employees, the paying of a preemptive bonus to undercut the Union and several discriminatory reprisals against employees who were thought to be instigators in the organization drive. As to the findings and decision on interrogation and the bonus it suffices to say these are amply supported by substantial evidence.
 
 
 5
 We turn for more detailed consideration to the findings of discriminatory reprisals and we reject both of Kinter's objections, as to Woc and Kolesar, and the Union's appeal, as to Grund.
 
 
 6
 a. Joan Woc
 
 
 7
 1. The Board found that Woc was discriminatorily discharged on two occasions. As to the first dismissal, in August 1965, Kinter contends this was the result of Woc's insubordination and 'belligerence.' We think there is ample support in the record for the finding that 'Kinter discharged Woc as a reprisal for her union activities.'
 
 
 8
 The critical issue in a discharge case is whether the employee has been dismissed as part of a desire to hurt or to undercut the Union.[2] Kinter was openly hostile to labor activity, and, even prior to Woc's discharge, had demonstrated his anti-union animus. Kinter knew Woc was a central figure in the organization drive. Vera Morely, an employee, testified Kinter had said to her that Woc was a 'troublemaker,' and 'that he was going to get rid of her one way or another.'
 
 
 9
 2. Woc was rehired by Kinter after the first hearing in this case, and returned to the store March 3, 1966, where she continued in Kinter's employ until August 3, 1966. The Board found that the circumstances under which she quit at that time amounted to a constructive discharge that was discriminatory and unlawful.
 
 
 10
 Although Kinter expressed no conditions at the time of Woc's reinstatement, the duties assigned her were different from those of the pre-Union days. Her pre-Union routine had been primarily to serve at the cash register, change prices and put up stock when business was slow, and fill in at the postal substation operated by the store. Upon her return Woc was primarily called upon to perform menial clean-up chores around the shop, chores that had been only a lesser part of her pre-Union routine.
 
 The Examiner also found that:
 
 11
 Although it had always been understood * * * that the most senior cashier had some kind of priority on the choice of (job) shifts, Woc was not given the opportunity to work the day shift, which she preferred.
 
 
 12
 Instead, Woc was assigned to a less desirable shift, even though the senior cashier retired shortly after Woc's return and new employees were hired.
 
 
 13
 On July 16, Woc, due to 'her constant nervousness,' consulted her doctor, who advised her to take a week off from work. She informed Kinter that she would not be at work for a week. When Woc subsequently called Kinter to tell him she would be available, he told her that the schedule for the coming week had already been drawn up and that she was not included. When Woc finally returned to work, August 3, she was again harassed and put to menial chores, seemingly without cause. The Trial Examiner, crediting Woc's testimony, found that the 'day's events had left her upset and nervous,' and forced her to consult again with her doctor. On August 4, Woc wired Kinter:
 
 
 14
 Due to your treatment and action against me yesterday I have become ill and unable to work. Will let you know when I will return.
 
 
 15
 A finding of constructive discharge depends on '(Whether the employer) deliberately made * * * working conditions intolerable and drove (the employee) into 'an involuntary quit." NLRB v. Tennessee Packers, Inc., 339 F.2d 203, 204 (6th Cir. 1964).[3]
 
 
 16
 The evidence is by no means one-sided and it is possible to draw conflicting inferences from the underlying facts. The Examiner's conclusions were favorable to Kinter. However, the Board, reviewing the primary facts found by the Examiner, concluded that Woc was constructively discharged since she was forced to quit by the humiliating and onerous conditions imposed as part of Kinter's continuing effort to undercut the Union.
 
 
 17
 We have reviewed the testimony and studied the opinions of both the Board and the Examiner. We are satisfied that the Board addressed itself 'to the salient conclusions and reasoning of the Examiner,' and that there is substantial evidence to support the Board,[4] 'even though there is also sub stantial evidence to support the contrary conclusion of the examiner.'[5]
 
 
 18
 b. Helen Kolesar
 
 
 19
 Employee Kolesar worked in the meat department as a wrapper. Until July 26, 1965, she regularly worked thirty-three hours per week. The following week, after Kinter learned of the Union drive, Kolesar's work hours were reduced to twenty-five hours. She did not again work a thirty-three hour week in 1965 except on two occasions. Kinter testified, without offering supporting evidence, that his sales of meat had fallen off, but, as the Examiner noted in rejecting this explanation, Kinter 'offered no details or substantiation.' The Examiner concluded, 'In the light of its timing and other evidence of Kinter's opposition to the Union,' that the reduction in hours was a discriminatory measure taken as reprisal for Kolesar's suspected involvement with the Union. This finding is supported on the record.
 
 
 20
 There is substantial evidence that Kinter's anti-Union animus erupted in unlawful interrogation and other numerous unfair labor practices. Kolesar testified Kinter had asked her to sign a card indicating whether she had talked with anyone from the Union. When she sought to avoid the inquiry he accused her of contacting the Union. Kinter's hostility to the Union, his suspicion of Kolesar's involvement, combined with the timing of Kolesar's reduction in hours, amply supports a finding of discrimination. Compare Rivers Mfg. Corp. v. NLRB, 376 F.2d 511, 515 (6 Cir. 1967).[6]
 
 
 21
 c. Olga Grund
 
 
 22
 The Union appeals from the Board's order relating to Olga Grund, who was the senior cashier. The complaint alleged her duties had been changed because of her involvement with the Union, and that she had been discriminatorily suspended on three occasions. The Examiner (and Board) concluded that there was no need to decide whether Grund was entitled to be reinstated to her former duties, since she had voluntarily left Kinter.[7] He also found that the three suspensions resulted from unjustified insubordination, and refused to award back pay.
 
 
 23
 The Examiner's conclusion, adopted by the Board, was that Grund's assignment was changed by Kinter in an attempt to undercut the Union. He further concluded, however, that Grund was openly uncooperative in refusing to assist the new postal assistant in the performance of her duties, and that the insubordination was not justified by the earlier discrimination, since Grund was not asked to perform 'onerous, arduous, or demeaning' tasks.[8] We see no reason to modify the Board's order limiting relief in respect to Grund.
 
 
 24
 II SECTION 8(a)(5) CHARGES: REFUSAL TO RECOGNIZE, GOOD FAITH DOUBT.
 
 
 25
 We turn now to the question of whether Kinter's refusal to recognize and bargain with the Union after the Union claimed recognition on October 27, 1965, constituted a violation of section 8(a)(5) of the Labor Act, as was held by the Examiner and the Board.[9]
 
 
 26
 a. The validity of the signatures
 
 
 27
 Kinter contends that the Board erred in finding that a majority of the unit wanted the Union. The starting point for our inquiry is the cards themselves, which were forthright in stating their purpose-- to authorize the Union as representative and collective bargaining agent. The only statement on the card, and one that appears on its face, is this short, clear and direct authorization:
 
 
 28
 I, the undersigned, an employee of hereby authorize Retail Store Employees Union Local 880 to represent me for the purpose of collective bargaining.
 
 
 29
 Kinter claims two signatures-- Terry Radcliffe and Theresa Reichard-- were procured under false pretenses. The signing of such plain and unambiguous cards by an employee whose legal competency is not in issue is persuasive evidence of his intent, and can be vitiated only by clear and convincing evidence of gross misrepresentation.[10]
 
 
 30
 The record does not present the 'clear' evidence requisite to persuade us that employees were deceived as to the purpose of such a lucid and straight-forward card. Reichard and Radcliffe testified that the Union solicitors said that the cards were only 'to show the boss' that they had visited these employees.[11] The organizers denied this, and their testimony was given credit by the Examiner (and in due course the Board), based on both demeanor and the probabilities of the situation.[12]
 
 
 31
 In one aspect the issue is simple: When there is a conflict of testimony and one witness is believed over another, in material part on the basis of demeanor evidence, we cannot say there was no substantial evidence to support the Board.
 
 
 32
 The situation is not different because of its reference to the 'probabilities' of the situation. In deciding whether the Board's conclusion is unreasonable on the record we cannot fail to accord due deference to the Board's expertise in appraising these situations. We see no basis for withholding this deference from the Examiner's conclusion that it was unlikely that these experienced organizers resorted to such a 'transparently irrelevant appeal.'
 
 
 33
 Assuming, however, that the organizers put forward such an emotional gambit, was it the kind of crucial statement that so distorts the organizing effort as to vitiate the simple card? Was it not more likely such a relatively unimportant aspect of the discussion as to have only minor significance, indeed to drop entirely out of the recollection of the organizers? Both employees acknowledged signing the card and filling in the blanks calling for name, address, date, job description. Neither employee was a stranger to unionism. Radcliffe's father, who was in the room when the organizers paid their call, was a union shop steward. Reichard's mother-in-law was a union card carrier. It is clear that many things were said in each conversation, although no one witness recalled either conversation in full. The card itself appealed to the principles of unionism, through quotations in the margins selected from the utterances of America's presidents.[13] As might well be supposed, the organizers also, apparently, held out a hope of specific benefits to come: Reichard specifically recalled that they advised her the Union would obtain higher wages and better working hours (supra note 11).
 
 
 34
 Recollections of what took place were somewhat murky and contradictory. In contrast stands the plain and simple fact that two people, of presumptively average intelligence, read and signed a clear card, and also took the effort to fill in the information called for. See NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (June 16, 1969). The evidence put forward to negative the obvious inference that these employees wanted what they signed for is anything but 'clear and convincing.' See Amalgamated Clothing Workers (Hamburg Shirt Co.) v. NLRB, supra note 10.[14]
 
 
 35
 b. Disposition of the Case
 
 
 36
 We think our disposition of this case is controlled by the Supreme Court's recent rulings. In Gissel the Court affirmed the imposition of a bargaining order as to Sinclair as a remedy for an 8(a)(5) refusal to bargain, where the employer's unfair labor practices have as a practical matter impeded recourse to the election procedure as a means of effectuating the choice of the majority. The Court affirmed the First Circuit's enforcement of the Board's order, which had imposed a bargaining remedy, on the ground that the employer's unfair labor practices were so extreme and highly coercive as to require such an order to effectuate the purpose of the act even assuming there had been no violation of 8(a)(5).
 
 
 37
 The Gissel-Sinclair ruling makes it clear that the Board order now before us must be enforced. The Board adopted the Examiner's conclusions, which included a determination that the employer's refusal to bargain was not due to a good faith doubt as to the Union's majority status, and that hence there was a violation of 8(a)(5). The Board also determined specifically--
 
 
 38
 3. Because of the Respondent's widespread unfair labor practices beginning in July 1965, about the time the Union initially obtained majority status, we find that the policies of the Act would be effectuated by ordering the Respondent to bargain collectively with the Union, on request, even if the Respondent's refusal of the Union's bargaining request of October 27, 1965, were held not to violate Section 8(a)(5).
 
 
 39
 This determination, that the unfair labor practices were so extreme as to require a bargaining order even in the absence of an 8(a)(5) violation, necessarily includes the lesser determination that the practices were so pervasive as to have the tendency to undermine majority strength and impede the election process, and hence to warrant a bargaining order as a remedy for an unlawful refusal to bargain. That is the teaching of Gissel-Sinclair (395 U.S. 614-616).
 
 
 40
 Petition for enforcement granted.
 
 
 41
 Petition for review denied.
 
 
 
 [1]
 See National Labor Relations Act, as amended, 29 U.S.C. 151 et seq. (1964)
 
 
 [2]
 See NLRB v. Longhorn Transfer Service, Inc., 346 F.2d 1003, 1006 (5th Cir. 1965); NLRB v. Symons Mfg. Co., 328 F.2d 835, 837 (7th Cir. 1964); NLRB v. Whitin Machine Works, 204 F.2d 883, 885 (1st Cir. 1953); cf. Tri State Maintenance Corp. v. NLRB, 132 U.S.App.D.C. 368, 408 F.2d 171 (1968)
 
 
 [3]
 See also NLRB v. United States Air Conditioning Corp., 336 F.2d 275, 276 (6th Cir. 1964) ('evidence shows obvious and material deviation from the 'former or substantially equivalent' work without any valid economic justification * * *'); Bausch & Lomb Optical Co. v. NLRB, 217 F.2d 575, 577 (2d Cir. 1954); NLRB v. Saxe-Glassman Shoe Corp., 201 F.2d 238, 242-243 (1st Cir. 1953) (employee quit because of 'interrogation' and 'harassment' that was 'affecting her health')
 
 
 [4]
 Woc testified in substance that she felt uncomfortable because she was treated with less civility than the other employees and that she was upset generally by the hostile atmosphere at work. We need not here consider whether or at what point unpleasantness by the employer may be enough to justify a finding of 'constructive discharge.' In Woc's case the testimony supports a finding of discriminatory treatment in job assignment and nature of the work, and hostile and humiliating treatment, which impaired her health. Compare NLRB v. Saxe-Glassman Shoe Corp., supra note 3
 The determination of what circumstances justify a finding of constructive discharge, is a matter best worked out on a case-by-case basis, until the Board develops a settled policy, and we defer to the Board, absent a finding of an abuse of its discretion. Cf. Atlantic Seaboard Refining Co. v. FPC, 131 U.S.App.D.C. 291, 404 F.2d 1268 (1968). Here the Board drew a distinction, as will appear below, between the cases of Woc and Grund.
 
 
 [5]
 Quotation from Lorain Journal Co. v. FCC, 122 U.S.App.D.C. 127, 131, 351 F.2d 824, 828 (1965), cert denied, WWIZ, Inc. v. FCC, 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308 (1966). See also FCC v. Allentown Broadcasting Corp., 349 U.S. 358, 364, 75 S.Ct. 855, 99 L.Ed. 1147 (1955); Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Amalgamated Clothing Workers of America (Hamburg Shirt) Co. v. NLRB, 125 U.S.App.D.C. 275, 280, 371 F.2d 740, 745 (1966); 2 K. Davis, Administrative Law Treatise 10.04, at 21-26 (1958)
 
 
 [6]
 The Examiner's decision limited back pay to the period August 1967-March 1968, when Kolesar was returned to a full work week (after another employee left). He found economic justification adduced by Kinter for a subsequent reduction of Kolesar's hours. This issue presents a closer case, but on balance we think the Board did not abuse its discretion when it rejected the conclusions of its Examiner, 'inferring from all the circumstances' that 'respondent was continuing its campaign to 'freeze out' Kolesar.' See note 5, supra
 
 
 [7]
 The Trial Examiner's order, approved by the Board, provided that Grund should be made whole for any loss of pay suffered because of discriminatory rescheduling, but that she was not entitled to reinstatement, or pay lost during time suspended
 
 
 [8]
 The Trial Examiner did not rely on Kinter's testimony alone, but was influenced by the testimony of Barbara Locker, who corroborated Kinter's version of the Grund episode. Under the circumstances the Board's finding is beyond question supported by substantial evidence
 
 
 [9]
 There is a dispute as to the appropriate bargaining unit. At the time of the Union's request for recognition thirteen people were employed at the Kinter store, including Harold Kinter, the owner. The Trial Examiner's conclusion, adopted by the Board, was that the appropriate unit consisted of all the employees, excluding Kinter and his brother Howard, but including Woc, who had been discriminatorily discharged. We think the Board was well within its discretion. See, e.g., Packard Motor Car Co. v. NLRB, 330 U.S. 485, 491, 67 S.Ct. 789, 91 L.Ed. 1040 (1947); S. D. Warren Co. v. NLRB, 353 F.2d 494, 497-498 (1st Cir. 1965), cert. denied, 383 U.S. 958, 86 S.Ct. 1222, 16 L.Ed.2d 300 (1966)
 
 
 [10]
 See Amalgamated Clothing Workers (Hamburg Shirt) v. NLRB, 125 U.S.App.D.C. 275, 280, 371 F.2d 740, 745 (1966); International Union, United Automobile, Aerospace and Agr. Implement Workers (Preston Products) v. NLRB, 129 U.S.App.D.C. 196, 202, 392 F.2d 801, 807 (1967), cert. denied, 392 U.S. 906, 88 S.Ct. 2058, 20 L.Ed.2d 1364 (1968)
 
 
 [11]
 This, then, is not the usual claim-- that the organizers represented that the only purpose was to obtain a vote recording the wishes of the employees either way. While Mrs. Reichard testified that the Union men told her 'that they were going to bring the booth in and that everyone would vote individually if they wanted the Union,' she also testified that they 'mentioned the fact that (she) would get higher wages and better working hours and things like that. Mrs. Reichard's testimony is none too clear, since it is highly improbable that she was deceived as to the possibility of an election. She only mentioned that fact upon questioning by the Trial Examiner. She also admitted that the men stayed at her home for about thirty minutes, but that she did not recall most of what was said
 
 
 [12]
 Said the Examiner: 'It strikes me as unlikely that experienced Union officials as these were, would resort to such a transparently irrelevant appeal, particularly in the presence of adult members of the signer's family.'
 
 
 [13]
 THOMAS JEFFERSON: 'The mass of mankind has not been born with saddles on their backs, nor a favored few (born) to ride them. * * *'
 ABRAHAM LINCOLN: 'All that serves labor serves the nation. All that harms is treason * * * if a man tells you he loves America, yet hates labor, he is a liar. * * * There is no America without labor, and to fleece the one is to rob the other.'
 THEODORE ROOSEVELT: 'Wage workers have an entire right to organize.'
 WOODROW WILSON: 'The only way to keep men from agitating against grievances is to remove the grievance. While we are fighting for freedom, we must see, among other things, that labor is free.'
 FRANKLIN D. ROOSEVELT: 'If I were a worker * * * the first thing I would do would be to join a union.'
 HARRY S. TRUMAN: 'The right to join a union of one's choice is unquestioned today and is sanctioned and protected by law.'
 DWIGHT D. EISENHOWER: 'Only a fool would try to deprive working men and women of the right to join the union of their choice.'
 
 
 [14]
 Some of the language in our opinions may be taken as suggesting that a card plainly stating the purpose to designate the Union as representative and bargaining agent may not be impeached unless there were representations to the effect that its only purpose is an election. See Amalgamated Clothing Workers (Sagamore Shirt) v. NLRB, 124 U.S.App.D.C. 365, 365 F.2d 898 (1966). However, it is clear that the ultimate test of these cases is whether there has been 'clear evidence of misrepresentation,' see Amalgamated Clothing Workers (Hamburg Shirt) v. NLRB, supra note 10, later refined in terms of 'gross misrepresentation.' See International Union, United Automobile, Aerospace and Agr. Implement Workers v. NLRB, supra, 129 U.S.App.D.C. at 202, 392 F.2d at 807. See also United Steelworkers v. NLRB, 126 U.S.App.D.C. 215, 376 F.2d 770, cert. denied, Northwest Engineering Co. v. NLRB, 389 U.S. 932, 88 S.Ct. 297, 19 L.Ed.2d 285 (1967); International Union, United Automobile, Aerospace and Agr. Implement Workers v. NLRB, 124 U.S.App.D.C. 215, 363 F.2d 702 (1966); Amalgamated Clothing Workers (Sagamore Shirt) v. NLRB, supra; NLRB v. S.N.C. Mfg. Co., 122 U.S.App.D.C. 145, 352 F.2d 361, cert. denied, SNC Manufacturing Co. v. NLRB, 382 U.S. 902, 86 S.Ct. 235, 15 L.Ed.2d 155 (1965)
 The rule traces back to the Board's decision in Cumberland Shoe Co., 144 N.L.R.B. 1268 (1963), enforced, sub nom. NLRB v. Cumberland Shoe Corp., 351 F.2d 917 (6th Cir. 1965). The Cumberland test, as applied by this circuit, is in harmony with the approach announced by the Supreme Court in NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (June 16, 1969). In 'resolving the conflict among the circuits in favor of approving the Board's Cumberland rule,' the Supreme Court said (p. 606, 89 S.Ct. p. 1936):
 we think it sufficient to point out that employees should be bound by the clear language of what they sign unless that language is deliberately and clearly canceled by a union adherent with words calculated to direct the signer to disregard and forget the language above his signature. * * * We cannot agree with the employers here that employees as a rule are too unsophisticated to be bound by what they sign unless expressly told that their act of signing represents something else.