**J. P. STEVEN & CO., INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**INDUSTRIAL UNION DEPARTMENT, AFL–CIO, and Textile Workers Union of America, AFL–CIO, Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Nos. 14739, 14842.**

United States Court of Appeals, Fourth Circuit.

June 6, 1972.

Whiteford S. Blakeney, Charlotte, N. C., for J. P. Stevens & Co., Inc.

Joseph Mayer, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison W. Brown, Jr., Atty., N. R. L. B., on brief), for N. L. R. B.

Alan S. Gordon, New York City (Patricia E. Eames, Gen. Counsel, and Cornelius J. Collins, Jr., Asst. Gen. Counsel, Industrial Union Dept., AFL–CIO, and Textile Workers Union of America, AFL–CIO, New York City, on brief), for Industrial Union Dept., AFL–CIO, and Textile Workers Union.

Before BOREMAN and BRYAN, Senior Circuit Judges, and CRAVEN, Circuit Judge.

BOREMAN, Senior Circuit Judge:

These cases are before us upon the petitions of J. P. Stevens & Co., Inc. (hereinafter "Stevens" or "the Company"), and the Industrial Union Department, AFL–CIO, and Textile Workers Union of America, AFL–CIO (hereinafter "the Union"), to review an order of the National Labor Relations Board, and upon the Board's cross-application for enforcement of its order. The Board's "Decision and Order," dated June 5, 1970, is reported at 183 NLRB No. 5.

Stevens, a Delaware corporation engaged in the manufacture and distribution of textile products, owns and operates about 85 textile plants throughout the country. Within the Company's Synthetics Division is a group of six mills constituting the "Shelby group," including a plant in Shelby, North Carolina, known as the Cleveland Plant. The Board found that the Company violated § 8(a) (1) of the National Labor Relations Act by *announcing* at the Cleveland Plant the establishment of an additional paid holiday two days before a scheduled Board election, in order to influence the outcome of the election. The Company also operates two hosiery manufacturing plants in Hickory, North Carolina, known as Longview Plant #1 and Longview Plant #2. The Board found that the Company violated § 8(a) (1) and (3) of the Act at Longview Plant #1 by interrogating, threatening and coercing employees and by constructively discharging employee Geneva M. Beck because of her union activities. The Board's order, in addition to the usual posting of notices and reinstatement provisions, directed extraordinary relief, as hereinafter explained. We enforce the Board's order.

### The Cleveland Plant Election

A representation election was scheduled to be conducted at the Cleveland Plant on Wednesday, May 28, 1969. On

the preceding Monday, May 26, 1969, James Sheppard, General Manager of the Shelby group, gave three separate speeches to groups of employees assembled on each shift in the plant warehouse. Primarily, the content of each speech was the Company's opposition to the Union. During each speech he announced that, in keeping with the trend in the textile industry, there would be an "upward adjustment of wages," effective July 7, and that the Company was "incorporating an additional paid holiday." The selection of the day or date of the holiday to be added was not then announced. Similar announcements by posting notices were made at all 85 Stevens plants on May 26, but only at the Cleveland plant were the employees informed orally of the wage increase and additional holiday, in addition to the usual method of a written notice posted on bulletin boards.[1]

The Board found that the timing of the announcement of the wage increase was controlled by an industry-wide wage movement since several days preceding Stevens' announcement other companies had made similar announcements, particularly Burlington Mills, a recognized pace setter in the textile industry. There was no evidence, however, as to what other companies were doing with respect to holiday benefits, and the Board concluded that the *announcement* of the additional paid holiday two days before the scheduled election at the Cleveland Plant violated § 8(a) (1) of the Act.

In National Labor Relations Board v. Exchange Parts Co., 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435

(1964), the Supreme Court made clear its rationale in holding that it was an unfair labor practice for an employer to confer economic benefits on its employees for the purpose of inducing them to vote against a union. The Court stated:

"The danger inherent in well-timed increases in benefits is the suggestion of a fist inside the velvet glove. Employees are not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged." 375 U.S. at 409, 84 S.Ct. at 460.

The issue in such cases is the Company's motive. N. L. R. B. v. Gotham Industries, Inc., 406 F.2d 1306 (1 Cir. 1969); *see* Owens-Corning Fiberglass Corp. v. N. L. R. B., 407 F.2d 1357 (4 Cir. 1969). The question is whether there is substantial evidence to support a finding that the employer's intent in granting the benefit or in timing the announcement of the granting of the benefit was to restrict its employees' freedom of choice by giving them cause to infer that the benefit might be withdrawn or future benefits withheld should they select a union to represent them. Section 8(a) (1) "prohibits not only intrusive threats and promises but also conduct immediately favorable to employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect." *Exchange Parts, supra*, 375 U.S. at 409, 84 S.Ct. at 460.

The Company argues that it was only natural that it should announce the addi-

1. The trial examiner found that the Company had violated § 8(a) (1) of the Act by deviating at the Cleveland Plant from its usual practice of relying solely upon a written notice to disclose the new wage benefits and instead *orally* announcing such benefits two days before the scheduled election. The Board, however, disagreed with the trial examiner as to the legal effect of the announcement, orally, of the wage increase and held such an-

nouncement permissible "in view of [the trial examiner's] other findings that [the Company] was conforming to industry action in granting the wage increase, that written notices were placed on some plant bulletin boards during the first speech in accordance with [the Company's] past practice, and that the oral announcement was made in the context of a protected antiunion speech."

tional paid holiday at the same time as the wage increase. The Board answers that the Company could and should have postponed the announcement of the added holiday until after the election. Of significance here is the testimony of General Manager Sheppard as to why the Company proceeded with the announcement of a wage increase at the Cleveland Plant even though the election was proximate:

"Q. Would you state for the record why even though that election was scheduled, why you nevertheless went ahead and announced the improvements at this plant?

"A. We have always enjoyed the confidence and tried to merit the confidence of our people, and historically when a wage increase has been announced [by other companies in the textile industry], we have announced shortly thereafter. This announcement [of a wage increase on Friday, May 23, 1969, by Burlington Mills] was in the Charlotte Observer by Burlington. We knew that over the weekend our people would read it and they would be concerned about what action we would take.

.    .    .    .    .    .

"We were fully aware that an election was pending when we announced this increase. We didn't know—we knew that we couldn't be right if we gave the wage increase or if we didn't give it, that we were going to be wrong and could be attacked possibly on either grounds. I don't know but what we wouldn't have an unfair labor charge against us if we had failed to announce this with 84 Stevens' plants and a general industry wage increase taking place, for us to refrain—we don't know what the result would have been, but our decision was to go along and let our people know that we were giving a wage increase along with J. P. Stevens and along with the industry.

.    .    .    .    .    .

"Q. Mr. Sheppard, sir, when was it and how was it that you first learned that any mills had announced that they were going to give a wage increase in '69?

.    .    .    .    .    .

"[A.] I know I read it in the Charlotte Observer over the weekend, but we are in communication with our headquarters and around by telephone, and quite often within an hour after Burlington would announce, I would know it, but I couldn't say exactly when I knew it or who told me on the telephone or anything, but this word spreads through the industry like wildfire when the first man comes out with a wage increase."

■ Sheppard's testimony, credited by the trial examiner, supports the conclusion that the decision of the Company not to postpone the announcement of the wage increase until after the election was reasonable and justified because the employees, upon learning of the wage increase in the rest of the industry, would have expected the Company to follow, as was its custom, the industry trend. However, only counsel's argument that it was "natural and reasonable that the announcement of [the holiday benefit] would have been made at the same time and in the same notice with the announcement of the wage increase," is offered as justification for informing the employees of the additional holiday, the date of which had not even been decided upon. There was no evidence of industry-wide action as to holiday benefits. Absent a showing by the Company of a proper business purpose or necessity the timing of the announcement of the grant of an additional holiday so close to the election is itself evidence of unlawful motive. See Lincoln Manufacturing Co. v. N. L. R. B., 382 F.2d 411 (7 Cir. 1967), cert. denied, 389 U.S. 972, 88 S. Ct. 470, 19 L.Ed.2d 463; Browning Industries, Inc., 142 N.L.R.B. 1397, 1400 (1963). The Board was also influenced by the context in which the announcement was made, i. e., as a part of an

antiunion speech which, though not improper in and of itself, provided a backdrop and setting for the bestowal of the holiday benefit and further evidenced improper motive. We find substantial evidence to support the Board's conclusion that the Company's announcement of an additional paid holiday two days before the scheduled Board election violated § 8(a) (1) of the Act.

### The Discharge of Geneva M. Beck

Prior to her termination, Geneva Beck was employed for about three years as a "mender" in Longview Plant #1. For the eighteen months immediately preceding her termination, Beck worked on the first shift as the only griege mender in her department. Using a portable mending machine, she moved throughout the department mending flaws in stockings. Until May 26, 1969, Beck was paid an hourly wage of $1.91.

In late February 1969 the Union began an organizational campaign at Longview Plant #1. Beck's testimony, credited by the trial examiner, shows clearly that the Company knew of her support of the Union's cause, and that the attitude toward Beck of her supervisors became hostile after they learned of such support. On April 14, Beck was informed that she would henceforth perform her mending with a different, manually operated machine at a stationary location where a table had been installed. She was told that, after a trial period, she would no longer be paid an hourly wage, but would be compensated on a production rate to be determined by a time study during the trial period.

From April 14 to May 26, Beck worked under the new system. During this period, her best daily production was 27 dozen, which equalled her best daily production prior to the modification of her operating procedures. Neither Beck's work nor her rate of production had ever been criticized, and her former supervisor had complimented her on her work performance.

On May 26, although no time study was ever undertaken, Beck was told that effective that morning she was being paid on production at the rate of 27 cents per dozen. Beck protested, to no avail, that the rate was unfair, asserting that it would be impossible for her to earn the federal minimum wage of $1.60 per hour, much less her former wage of $1.91 per hour.[2] On Monday, June 2, Beck informed her supervisor that if they "couldn't work something out" to bring her pay up to her former wage of $1.91 per hour, "that would be [her] last week." Beck did not return to work after Wednesday, June 4.

■ Where an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job because of union activities or union membership, the employer has constructively discharged the employee in violation of § 8(a) (3) of the Act. N. L. R. B. v. Cavalier Olds, Inc., 421 F.2d 1234 (6 Cir. 1970); Retail Store Employees Union Local 880, R. C. I. A. v. N. L. R. B., 136 U.S.App.D.C. 27, 419 F.2d 329 (1969); N. L. R. B. v. Holly Bra of California, Inc., 405 F.2d 870 (9 Cir. 1969). Here, the Board accepted the trial examiner's finding that Beck's production rate "was set at an artificially low level" for the purpose "of causing [her] to resign." The Company argues that this conclusion is wholly refuted by other findings of the trial examiner. We cannot agree.

■ The trial examiner did accept as fact that 98% of the menders at Longview Plant #1 were assigned to stationary work on a piece rate basis, that the 27 cents per dozen rate was based on the rate already established for menders in at least three other plants, and that experienced menders at Longview Plant #2 working at the rate of 27 cents per

---

2. It appears that, at the piece rate of 27 cents per dozen, Beck would have had to substantially increase her daily production to reach even the minimum rate of $1.60 per hour.

dozen earned in excess of $2.00 per hour. As the trial examiner noted, however, the evidence indicated that there were variations between Beck's job and that of other menders and "[i]n the absence of any evidence shedding suspicion upon Beck's capabilities as a mender, the evidence that some menders working at the 27 cent per dozen rate earn at hourly rates higher than Beck's former rate is not determinative." There was no evidence as to the production of any other operator performing the identical tasks that Beck was called upon to perform. The record provides substantial support for the conclusion that Beck was constructively discharged from her position because of her support for the union.

Further violations [of § 8(a) (1)] found by the Board to have occurred at Longview Plant #1 were grounded upon incidents indicative of the changed attitude of Company supervisor Kenneth Greer toward Beck after Greer learned of Beck's support of the Union. We think that the credited testimony of Beck as to these incidents was substantial evidence to support the Board's conclusions.

### The Remedy

The Board's order, in addition to the usual posting of notices and reinstatement provisions, required the Company to mail copies of the notice to each employee in the Cleveland and Longview #1 plants; to grant the Union reasonable access to bulletin boards in those plants for one year; to make available to the Union the names and addresses of all employees at those plants; and to read, or allow a Board agent to read, the contents of the notice to the employees at those plants. The Company argues that the Board exceeded its authority in directing these extraordinary remedies. The Union seeks to expand the scope of the order to include all Stevens plants in North Carolina, South Carolina and Georgia.

Remedies are "peculiarly a matter of administrative competence."

Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941); *accord,* Fibreboard Paper Products Corp. v. National Labor Relations Board, 379 U.S. 203, 216, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). "[The order] should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." Virginia Electric & Power Co. v. National Labor Relations Board, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943). It does not appear that the Board abused its broad discretion in fashioning extraordinary relief in this case. The Company has a long history of improper antiunion activity. The Board's refusal to extend the scope of its order beyond the plants involved herein was well within its established powers.

Enforcement granted.

